UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION


RAYMOND SMITH,                          :     CASE  NO.  1:00 CV 1961
                                        :
                Petitioner,             :
                                        :     JUDGE LESLEY WELLS
        vs.                             :
                                        :
MARGARET BAGLEY, Warden,                :
                                        :     MEMORANDUM OF OPINION
                Respondent.             :     AND ORDER



        This matter is before the Court upon Petitioner Raymond Smith's ("Petitioner" or "Mr. Smith")

Petition for Writ of Habeas Corpus, filed pursuant to 28 U.S.C. § 2254.  Through this petition, Mr.

Smith challenges the constitutionality of his conviction, rendered by an Ohio court.  (ECF No. 44.)

The Respondent, Warden Margaret Bagley ("Respondent"), filed a Return of Writ.  (ECF No. 71.)

Mr. Smith filed a Traverse, and Respondent, a Sur-Reply.  (ECF Nos. 127 and 131, respectively.)  For

the following reasons, the Petition for Writ of Habeas Corpus is denied.

I.      **Factual History**

        On March 8, 1995, a Lorain County, Ohio, grand jury indicted Mr. Smith for the aggravated

murder of Ronald Lally.  The grand jury also separately indicted Mr. Smith's son Daniel ("Danny")

Smith and Stanley Jalowiec for Mr. Lally's murder.  The indictment charged Mr. Smith with one

count of murder with prior calculation and design pursuant to Ohio Revised Code § 2903.01(A).  It

also included a firearm specification under Ohio Revised Code § 2941.141, and a capital specification

under Ohio Revised Code § 2929.04(A)(8), alleging that Mr. Smith purposely killed Mr. Lally in order

to prevent him from testifying against him in a separate criminal proceeding.  (ECF No. 122-1, 12.)

Mr. Smith entered a plea of not guilty to all charges.  (*Id*. at 17.)

The Ohio Supreme Court set out the following factual history, as adduced by the evidence

presented at trial, upon considering Mr. Smith's direct appeal of his conviction and sentence:

> On the morning of January 19, 1994, a partially clad male body was found in a Cleveland cemetery. Two weeks later, the body was identified as that of Ronald Lally of Elyria. Over a year later, defendant-appellant, Raymond Smith, and two others including his son, Danny Smith, were indicted for aggravated murder, a firearm specification, and a death penalty specification, alleging that Lally was purposely killed to prevent his testimony in a separate criminal proceeding. Subsequently, a jury found appellant guilty as charged, and he was sentenced to death.
>
> In June 1993, Ronald Lally contacted the Elyria police and advised them that he wanted to reform himself and stop doing drugs. He felt the best way he could do that was to turn in his supplier. Lally signed an agreement with Elyria Police Detective Alan L. Leiby to become a confidential informant for the Elyria Police Department. On June 7, 1993, with Leiby's assistance, Lally was wired with a hidden monitoring device and made a controlled drug buy of crack cocaine from Danny and appellant. As a result of the controlled buy, police arrested Danny and appellant in August 1993 and charged them with aggravated drug trafficking. Both cases were eventually set for trial on January 19, 1994.
>
> Lally's fiancée, Sandra Williams, testified that on September 7, 1993, Danny approached her in her yard. Danny said he knew where Lally was and told her that Lally would feel "real bad" if anything happened to her or to members of Lally's family. Danny also told Williams that he knew where Lally's parents lived and that it would be a shame if their trailer happened to get blown up.
>
> On the afternoon of September 15, 1993, Police Officer John Homoki responded to a disturbance call at the Mr. Hero's restaurant on Middle Avenue in Elyria. As he pulled into the Mr. Hero's parking lot, Homoki noticed Stan Jalowiec turn around and walk away from the area. He then saw Lally and Danny talking in front of the store doorway. Lally appeared to be extremely upset.
>
> Lally hurried across the lot to Homoki's cruiser and told Homoki: "John, these guys are going to fuck me up." Lally explained that he was a police informant, that he

2

had bought drugs from these individuals, and that they had threatened to kill him. Homoki yelled over to Jalowiec to stand by, and then approached Danny, who said excitely while pointing to Lally: "That punk ass bitch * * * is going to get his." Danny then denied that he was threatening Lally. Consequently, Homoki asked Lally if he wanted to pursue charges for intimidation, but Lally declined, saying that he just wanted to get out of the area.

A few months before January 1994, Danny approached Terry Hopkins and asked him to "kill somebody," but Hopkins declined. Danny told Hopkins that he wanted the person killed "because he had informed the police of his doings."

Brian Howington, a nephew of Joann Corrine Fike, knew appellant through his visits to his aunt's house. On the evening of January 18, 1994, Howington went with Jalowiec to a couple of bars in his aunt's car, a Chrysler LeBaron convertible. Jalowiec asked Howington to take him to "a friend's house," and the pair went to Lally's apartment on Middle Avenue. There, they smoked crack cocaine with Lally and his roommate. Around 10:00 p.m., the group went over to the aunt's house, "partied some more and shot some pool." Jalowiec received a message or a page on his beeper, and he asked Howington if he could borrow the aunt's LeBaron. At first, Howington said no, but after Jalowiec pleaded with him repeatedly, Howington relented and let him borrow the LeBaron. According to Howington, Jalowiec and Lally left the aunt's house at around midnight.

Around 11:00 p.m., Sharon Hopkins went to Razzle's bar in Elyria with her brother Terry Hopkins, appellant and his two sons, Michael and Danny Smith, and several other people including Stan Jalowiec. The group stayed at Razzle's until it closed, and then went to eat at Mom's Open Kitchen until around 2:45–3:00 a.m. However, Jalowiec was not with the group at Mom's Open Kitchen. After leaving Mom's Open Kitchen, Sharon Hopkins rode in a car driven by Danny that included Michael and appellant. The car went past the railroad tracks on Middle Avenue whereupon appellant and Michael Smith got out of the car and walked over to a barn in the woods. Danny drove the car back across the tracks and into a parking lot where he parked the car with the lights off.

Around five to ten minutes later, a LeBaron convertible went past the parking lot, over to where appellant and Michael were dropped off. Shortly thereafter, the LeBaron drove back across the tracks and proceeded north towards town. Danny then followed the LeBaron in his car and signaled the driver to pull over. Danny ducked down in the driver's seat, and Sharon Hopkins noticed that Jalowiec was driving the LeBaron and that there were three other people in the vehicle. However, Sharon could not identify the other occupants of the LeBaron. Danny then drove away and dropped Sharon off at her apartment.

At around 3:30 that January morning, Terry Hopkins arrived at Danny's

3

apartment after the group had left Mom's Open Kitchen. Danny was there and appeared to be "nervous, bothered." Danny said "he was sick." He also said "they did it." Thereafter, Terry left and went to his sister's apartment.

After daybreak, Terry returned to Danny's apartment and found appellant, Danny, and Michael there with Jalowiec. While Terry Hopkins could not recall who specifically made what statement, he believed that Jalowiec said that "they had killed the guy." Moreover, "[t]hey said that they had shot the victim and they had run him over with a car and stepped on him and stabbed him with something * * *." According to Terry, "they were bragging about it."

At approximately 5:00 or 6:00 a.m. that same morning, appellant and Jalowiec returned the LeBaron convertible to Fike. According to Fike, the weather that morning was extremely cold and the car was covered with ice. According to Howington, the car was frozen because Jalowiec and appellant had just washed it. Fike noticed some blood in the car and also noticed that Jalowiec's knuckles were bleeding. But appellant and Jalowiec told Fike that there had been a fight behind Mom's Open Kitchen.

At approximately 9:55 a.m. on January 19, Cleveland Police Detective Michael Beaman answered a call reporting that a male body had been found on a driveway in a cemetery on Quincy Avenue in Cleveland. The partially clad and bloody body was lying face down on a cemetery roadway. The victim's shirt and coat were lying nearby on a snow mound, but there was no identification on or near the victim. Approximately two weeks later, Lally's family contacted Cleveland police about their missing relative from Elyria. Subsequently, members of the Lally family came to the Cuyahoga County Coroner's Office and identified the victim as Ron Lally. As a result of Lally's death, the aggravated trafficking charges against appellant and Danny Smith scheduled for trial on January 19 were dismissed.

Deputy coroner Dr. Heather N. Raaf, who performed the autopsy on Lally, concluded that Lally died from a non-fatal bullet wound to the head, and blows to the head causing brain injuries and a skull fracture. Dr. Raaf also noted that Lally had been cut in the neck with a knife. Dr. Raaf stated that if Lally was "not quite dead" when he was left in the cemetery, exposure to the cold would probably have contributed to his death in combination with the injuries he sustained. Dr. Raaf estimated the time of death to be somewhere between 2:30 a.m. and 8:30 a.m. on January 19.

The murder remained unsolved for several months. However, in June 1994, Danny Smith contacted Detective Leiby, hoping to make a deal on other criminal charges he was facing. Danny told Leiby that he would make a statement about his father (appellant) and the Lally homicide. Danny indicated that his father would not tell him the "whole story" of the Lally homicide, and that Leiby would have to speak with appellant directly. At one point, Danny offered to "wear a wire and talk to his father concerning the homicide."

4

On July 5, 1994, Leiby and two other detectives interviewed appellant on audiotape at Elyria police headquarters. After being advised of his *Miranda* rights, appellant told the detectives he had been riding in a car with Lally that was driven by a friend of Lally's. Appellant stated that at that time they were riding around smoking crack, and that Lally told him that he was not going to testify against him and Danny and that he was going to leave town. However, after about forty-five minutes of getting high on crack in the car, Lally demanded to know where Danny was because Danny "did somethin' to [Lally] at * * * Mr. Hero's * * *." Lally then pulled a gun on appellant. Continuing, appellant said that Lally cooled down some but then went back at him. According to appellant, this change of moods by Lally occurred several times in the car. Appellant had asked to get out of the car, but Lally refused to let him out.

After driving around Cleveland, Lally eventually directed the driver into a cemetery. There, Lally ordered appellant out of the car and made him get on his knees with his hands in his pockets. Lally was standing up against the car, still smoking crack and holding a gun. Appellant then hit Lally's leg and knocked him down. A struggle ensued, and according to appellant "[s]ome how the gun went off." Appellant claimed he ran off and hid behind a tombstone until the driver of the car left. He then walked out of the cemetery, went to a bus station, and took a "chitney" (*sic*) back to Elyria. He claimed that he did not know that Lally was dead until he read about it in the newspaper.

Subsequently, Danny contacted Leiby and asked him if he was satisfied with appellant's statement concerning the Lally homicide. Danny indicated that appellant was willing to make another statement. Leiby told Danny that he would speak to appellant only if he named the other person who was at the cemetery on the night Lally was killed.

On January 11, 1995, appellant had a taped phone conversation with Leiby. In that conversation, appellant was still attempting to help Danny out on pending charges filed against him. As a sign of good faith, appellant told Leiby, "it's Stan," meaning the name of the person who was with him and Lally at the cemetery.

On March 8, 1995, the grand jury indicted appellant on one count of aggravated murder with a firearms specification. In addition, a death penalty specification alleged that appellant purposely killed Lally in order to prevent his testimony as a witness in a separate criminal proceeding. R.C. 2929.04(A)(8).

Prior to trial, the court held a hearing to determine the admissibility of a deposition by Michael Smith, appellant's other son. The court had permitted Michael's deposition to be taken on June 16, 1995, in order to preserve his testimony. The state proffered two witnesses (Detectives Beaman and Leiby) who testified that Michael was not available to testify at trial in spite of numerous efforts to locate him. The trial court ruled that the deposition would be admitted unless Michael was found.

Trial was held before a jury. After both parties had rested, the prosecutor informed the trial judge that Leiby had talked on the telephone with Michael Smith, who was out of the state. Michael stated he was afraid of being arrested for probation violations. The prosecutor authorized Leiby to tell Michael that they would pay his way to come back and testify but that they could not promise him anything with regard to his probation. After Leiby told Michael this, he did not hear from him again.

In his deposition, which had been subject to cross-examination by counsel for all three co-defendants (appellant, Danny Smith, and Stan Jalowiec), Michael testified that he witnessed the murder of Lally, which took place around 4:30 a.m. in early January 1994. Michael stated that at around 2:45 that morning he met his father (appellant) and brother Danny at Mom's Open Kitchen in Elyria. Appellant made a phone call and the three left the restaurant in Danny's car. Danny drove Michael and appellant down Middle Avenue and dropped them off near the railroad tracks.

Approximately twenty to thirty minutes later, Jalowiec drove up in a blue LeBaron with Lally. Michael got in and sat in the back seat (driver side) next to Lally, and appellant sat in the front passenger seat. After they drove around a little while, appellant pointed a pistol at Lally and told him "Don't make no stupid moves." Lally at first denied setting Danny up in a controlled drug buy but later admitted that he had. Michael stated that at this point, Lally agreed to get on a bus to leave town. Jalowiec drove the car into East Cleveland in order to buy more crack. All during the trip, all four men were smoking crack cocaine. After seeing some police cars and fire trucks in East Cleveland, the group decided not to buy more crack, but drove around Cleveland for another forty-five minutes and ended up at the Woodland Cemetery in Cleveland.

When Stan stopped the car in the cemetery, appellant got out of the car and pointed his gun at Lally's face to force him out of the car as well. Michael heard appellant and Lally exchange words. He then heard a gunshot. Lally exclaimed: "Oh, you shot me in the head. You shot me in the head." Appellant asked Michael and Jalowiec to get out of the car. However, only Jalowiec got out and helped appellant beat up Lally. Appellant said something about the gun being jammed and asked Jalowiec for a knife. During this time, Michael could hear "the thumps and the smacks and the stomps." During the beating Lally pleaded: "I won't tell nobody. Don't kill me. Please don't kill me." Those were the last words Michael heard from Lally.

Appellant and Jalowiec tried to stuff Lally into the trunk, but he would not fit. Appellant and Jalowiec got back in the car, and Jalowiec tried to back the car up over Lally's body two or three times. However, each time Lally's body would stop the car's movement. Jalowiec then drove the car out of the cemetery, and he and appellant began to argue with Michael over what he should have done at the cemetery. During this time, appellant took his gun apart, throwing it away piece by piece out the window. Eventually, Michael was dropped off at his brother Danny's apartment.

6

Two of the state's witnesses at trial worked at the trace evidence lab of the Cuyahoga County Coroner's Office. Sharon Rosenberg testified that there was no evidence that Lally had fired a weapon. Linda Luke testified that red discoloration on a trunk liner piece from the LeBaron convertible tested out to be blood with DNA consistent with that of Ron Lally.

After the state rested, the defense presented one witness who was called to rebut Leiby's testimony that appellant threatened his son Michael at the close of his deposition. Leiby had testified that appellant declared at the end of Michael's deposition, "I raised the boy, now I got to kill him." The defense's sole witness, a private investigator who attended the deposition, testified that he construed appellant's comment as a non-threatening question. The state's rebuttal witness, a deputy sheriff, felt that appellant's statement was a serious threat. After deliberation, the jury found appellant guilty as charged.

At the mitigation hearing, appellant gave an unsworn statement claiming that he never killed Ron Lally. Also testifying on appellant's behalf were three relatives and the spouse of a cousin. The jury recommended death, and the court imposed the death sentence on appellant.

*State v. Smith*, 87 Ohio St. 3d 424, 424-29, 721 N.E.2d 93, 99-103 (Ohio 2000).

## II.      Procedural History

### A.      State-Court Proceedings

#### 1.      Trial

Mr. Smith's trial commenced on November 28, 1995.  He was represented by Attorneys

Harvey B. Bruner and Bret Jordon.  Mr. Smith retained Attorney Bruner in August 1995 to replace

court-appointed counsel Kenneth Lieux and Thomas Elwell, Jr.  On December 5, 1995, a jury found

Mr. Smith guilty of the murder charge and both the capital and firearm specifications.  (ECF No. 122-

1, 221-26.)  The penalty phase of the trial commenced on January 4, 1995.  The next day, January 5,

1995, the jury recommended that Mr. Smith be sentenced to death.  (*Id*. at 238-40.)  The trial court

accepted the jury's recommendation and sentenced Mr. Smith to death that same day.  (*Id*. at 241-43.)

The court issued its opinion and findings in support of its imposition of the death sentence on February

7

2, 1995. (*Id*. at 249-53.)

### 2. Direct appeals

Mr. Smith filed a timely appeal of the trial court's decision to the Ninth District Court of Appeals, again represented by Attorneys Bruner and Jordan. (ECF No. 122-2, 5-6.) He raised fourteen assignments of error as follows:

I.  The trial court violated Appellant's due process and equal protection rights under the [Fourteenth] Amendment of the [United States] Constitution and Article I of the Ohio Constitution and erred to the prejudice of Appellant when it granted the [S]tate's motion to take the deposition of Michael Smith pursuant to Crim. R. 15(A).

II. The trial court erred to the prejudice of Appellant and in violation of Appellant's due process rights when it denied Appellant's motion in limine to exclude the deposition of Michael Smith.

III. The trial court violated Appellant's due process and equal protection rights under the United States and Ohio Constitutions and erred to the prejudice of Appellant when it denied Appellant's motion to suppress his oral statements without conducting a pre-trial evidentiary hearing.

IV. The trial court erred to the prejudice of Appellant when it denied Appellant's motion to suppress his oral statements in violation of Appellant's Fifth and Fourteenth Amendment rights.

V.  The trial court erred to the prejudice of the Appellant when it permitted out-of-court statements made by Danny Smith to be presented at trial over Appellant's objections in violation of Appellant's Fourteenth Amendment rights.

    A. Danny Smith's statements to Officer John Homoki.

    B. Danny Smith's statements to Sandra Williams.

    C. Danny Smith's statements to Terry Hopkins erroneously admitted under Evid. R. 803(1), 803(3) or 804(B)(3).

    D. Danny Smith's statements to Terry Hopkins erroneously admitted under Evid. R. 801(D)(2).

VI. The evidence presented by the State of Ohio in its case in chief was insufficient

8

as a matter of law and pursuant to Rule 29 of the Ohio Criminal Rules of Procedure[, and] the trial court erred and violated Appellant's Fourteenth Amendment rights by not dismissing the charges against Appellant.

VII.    The verdict is against the manifest weight of the evidence.

VIII.    The prosecutor exercised two peremptory challenges in a racially discriminatory manner in violation of Appellant's rights under the United States Constitution's Equal Protection [C]lause.

IX.    Appellant's right to effective assistance of counsel as guaranteed by the [Sixth] Amendment to the [United States] Constitution and Article I, Section 10 of the Ohio Constitution was violated.

X.    During closing argument of the penalty phase, the prosecutor improperly commented on the nature and circumstances as aggravating factors in violation of [Ohio Revised Code §] 2929.04 and upon Appellant's unsworn testimony in violation of Appellant's [d]ue [p]rocess and [e]qual [p]rotection rights.

XI.    The trial court may not instruct the jury that their decision in the penalty phase is a recommendation.  This instruction is a violation of the Eighth and Fourteenth Amendments of the United States Constitution and Article I, Sections 9, 10 and 16 of the Ohio Constitution.

XII.    The trial court erred to the prejudice of Appellant and in violation of Appellant's [d]ue [p]rocess and [e]qual [p]rotection rights when it failed to comply with the requirements of [Ohio Revised Code §] 2929.03(F).

XIII.    Appellant's death sentence has denied him due process under the law as the trial court erred in adopting the recommendation of the jury and in finding that the aggravating circumstances outweighed the mitigating factor[s].

    A.    The [a]ggravating [c]ircumstances did not outweigh the [m]itigating [f]actors.

    B.    The [t]rial [c]ourt erred by not adhering to the language of [Ohio Revised Code §] 2929.03(D)(3).

XIV.    Imposition of the [d]eath [s]entence violates the [Sixth], [Eighth] and [Fourteenth] Amendments to the [United States] Constitution and Sections 2, 9, 10 and 16, Article I, of the Ohio Constitution.

    A.    Ohio's death penalty scheme deprives defendants of their lives without due process of law, denies equal protection and imposes cruel and

unusual punishment.

B.      [Ohio Revised Code §§] 2929.022, 2929.03, and 2929.04 violate the federal and Ohio rights to effective assistance of counsel and a trial before an impartial jury.

C.      [Ohio Revised Code §§] 2929.022, 2929.03, and 2929.04 violate the Eighth and Fourteenth Amendments to [t]he United States Constitution and Sections 9 and 16, Article I[,] of [t]he Ohio Constitution by not giving a jury adequate guidelines for how to balance the aggravating circumstances and mitigating factors.

D.      Unconstitutional burdens on the right to a jury trial and to be free from compulsory self-incrimination are created by [Ohio Revised Code §§] 2929.022, 2929.03, and 2929.04 and Crim. R. 11(C)(3).

E.      [Ohio Revised Code §] 2929.03 fails to provide a meaningful basis for distinguishing between life and death sentences, as it does not require the jury that recommends life imprisonment to specify either the mitigating factors found or [the] reasons for such sentence.

F.      Neither Ohio's death penalty scheme nor the Ohio Supreme Court have assured adequate analysis o[f] arbitrariness, excessiveness and disproportionality of death sentences.

G.      Appellate review provisions of  [Ohio Revised Code §] 2929.05 fail[] to require inquiry or findings regarding arbitrariness, passion or prejudice, and [are] constitutionally inadequate.

H.      The Ohio death penalty [scheme] impermissibly mandate[s] imposition of the death penalty and preclude[s] a mercy option in the absence of mitigating evidence or when aggravating circumstances outweigh mitigating factors and fails to require a determination that death is the appropriate punishment.

I.      [Ohio Revised Code §§] 2929.03, and 2929.04 and 2929.05 violate the Eighth and Fourteenth Amendments to the United States Constitution and Sections 9 and 16 of the Ohio Constitution by not requiring juries to decide the appropriateness of the death penalty.

J.      The Ohio death penalty scheme permits imposition of death on less than [an] adequate showing of culpability b[y] not requiring juries to decide the appropriateness of the death penalty.

K.      The Ohio "beyond a reasonable doubt" standard of proof fails to meet

10

the requirement for higher reliability for the [g]uilt determination phase of a capital case.

L.     [Ohio Revised Code §§] 2929.03, and 2929.04 and 2929.05 violate the Eighth and Fourteenth Amendments to the United States Constitution and Sections 9 and 16, Article I, of the Ohio Constitution by failing to properly allocate the burden of proof during [the] mitigation phase of trial.

(ECF No. 44-1.)  The court of appeals affirmed Mr. Smith's conviction and sentence on March 25, 1998.  *State v. Smith*, No. 96CA006331, 1998 WL 158966 (Ohio Ct. App. March 25, 1998).  It then appointed new counsel, Attorneys Irving B. Sugerman and Nicholas Swyrydenko, to represent Mr. Smith on his direct appeal to the Supreme Court of Ohio.  (ECF No. 122-4, 190.)

Mr. Smith timely appealed the court of appeals' decision to the Ohio Supreme Court on July 23, 1998, advancing the following eleven propositions of law:

I.     The trial court erred to the substantial prejudice of the defendant when it allowed out-of-court statements made by co-defendant Danny Smith to be introduced into evidence.

II.    A trial court violates a defendant's [c]onstitutional right to confrontation of witnesses against him when it allows a deposition of a witness to be taken without a showing that the witness will not be unavailable for trial, and when it allows such deposition transcript to be admitted into evidence without a showing of one of the four enumerated factors in Criminal Rule 15(F).

III.   Appellant's due process rights under the Fourteenth Amendment were violated as the result of errors which occurred during the voir dire process.

IV.    Persistent and pervasive prosecutorial misconduct prejudiced the Appellant throughout the trial and such conduct prejudicially affected the accused's substantial rights.

V.     The [S]tate failed to prove an essential element of the crime of [a]ggravated [m]urder, to wit: venue, in violation of Section 10, Article I of the Ohio Constitution and Ohio Revised Code § 2901.12.

VI.    The trial court committed reversible [c]onstitutional error when it gave improper instructions to the jury during the penalty phase of Appellant's trial.

11

VII.     Defense counsel's acts and omissions deprived Appellant of effective assistance of trial counsel as guaranteed by the Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Article [I], §§ 9, 10, and 16 of the Ohio Constitution.

VIII.     The trial court erred when it failed to comply with the requirements of [Ohio Revised Code §] 2929.03(F) and when it failed to state its specific findings as to the existence of mitigating factors set forth in [Ohio Revised Code §] 2929.04(B).

IX.     The trial court erred when it permitted highly prejudicial, nonprobative, irrelevant evidence and testimony to be introduced, and/or when it failed to give any limiting/curative instructions to the jury concerning such evidence.

X.     The sentence of death imposed upon Raymond Smith must be vacated because the aggravating circumstance does not outweigh the mitigating factors present in this case and the sentence of death is not appropriate.

XI.     Ohio's death penalty laws are unconstitutional. The [F]ifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution establish the requirements for a valid death penalty scheme. [Ohio Revised Code §§] 2903.01, 2929.02, 2929.021, 2929.022, 2929.023, 2929.04, and 2929.05 []. Ohio's death penalty statute does not meet the prescribed [c]onstitutional requirements and is unconstitutional on its face and as applied to Appellant Raymond Smith.

(ECF No. 44-2.) The Ohio Supreme Court affirmed Mr. Smith's conviction and sentence on January 5, 2000. *State v. Smith*, 87 Ohio St. 3d 424, 721 N.E.2d 93 (Ohio 2000).

### 3.     Post-conviction proceedings

#### a.     first post-conviction petition

During this time, Mr. Smith also initiated state post-conviction proceedings in the trial court under Ohio Revised Code § 2953.21. On July 2, 1996, Mr. Smith's appellate counsel Attorney Bruner filed a motion for appointment of counsel to file a motion for a new trial and a petition for post-conviction relief as well as transcripts of the trials of Smith's co-defendants, Daniel Smith and Stanley Jalowiec. (ECF No. 122-7, 12-13.) The State objected, and the motions were denied. (*Id*. at 14-17.)

12

On January 24, 1997, Mr. Smith, now represented by Attorney Mark Rudy, filed a post-conviction petition.  (*Id*. at 18-22.)  Mr. Smith filed an amended petition on January 27, 1997, and a second amended petition on January 28, 1997.  (*Id*. at 23-92, 93-115.)  Mr. Smith also filed a motion for discovery and expert assistance on January 28, 1997.  (*Id*. at 116-22.)  Mr. Smith then filed an amended petition on February 28, 1997, to add several pages to the second amended petition that were inadvertently omitted.  (ECF No. 122-8, 1-3.)

The second amended petition presented twelve claims, including thirty-four sub-claims, as follows:

1.     [T]he failure of defense counsel to adequately represent the Petitioner at the pre-trial, trial and mitigation phases of trial did not comply with minimum Constitutional standards of reliability required for the imposition of a death sentence under the Eighth and Fourteenth Amendments of the United States Constitution and Article I, Section 9 of the Ohio Constitution. . . .  The Petitioner was denied the effective assistance of counsel in the pre-trial phase of his case as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Article I, sections 10 and 16 of the Ohio Constitution. *Strickland v. Washington*, 466 U.S. 668 (1984). . .  Trial counsel for the Petitioner did not file a pretrial [m]otion for change of venue as a result of the pre-trial publicity * * * and failed to adequately voir dire the jury as to their knowledge regarding the crimes.

2.     [T]he failure of defense counsel to adequately represent the Petitioner at the pre-trial, trial and mitigation phases of trial did not comply with minimum Constitutional standards of reliability required for the imposition of a death sentence under the Eighth and Fourteenth Amendments of the United States Constitution and Article I, Section 9 of the Ohio Constitution. . . .  The Petitioner was denied the effective assistance of counsel in the pre-trial phase of his case as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Article I, sections 10 and 16 of the Ohio Constitution. *Strickland v. Washington*, 466 U.S. 668 (1984). . . .  The Petitioner's original trial counsel allowed the Petitioner to make incriminating statements to the investigating officer while in a state of intoxication and/or under the influence of narcotics . . . .

3.      [T]he failure of defense counsel to adequately represent the Petitioner at the pre-trial, trial and mitigation phases of trial did not comply with minimum Constitutional standards of reliability required for the imposition of a death

13

sentence under the Eighth and Fourteenth Amendments of the United States Constitution and Article I, Section 9 of the Ohio Constitution. . . .  The Petitioner was denied the effective assistance of counsel in the pre-trial phase of his case as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Article I, sections 10 and 16 of the Ohio Constitution.  *Strickland v. Washington*, 466 U.S. 668 (1984). . . .  Counsel for the Petitioner was ineffective when he failed to file a motion to disqualify the trial court, whereas the trial court had previously cooperated with the State and police when he agreed to grant shock probation to a key State's witness, Terry Hopkins, in exchange for his testimony at the trial of the Petitioner. . . . Petitioner, due to the ineffectiveness of trial counsel, was tried by a Court who had used it's [*sic*] [j]udicial powers to further the ends of the State in an unfair and prejudicial  manner.

4.     [T]he failure of defense counsel to adequately represent the Petitioner at the pre-trial, trial and mitigation phases of trial did not comply with minimum Constitutional standards of reliability required for the imposition of a death sentence under the Eighth and Fourteenth Amendments of the United States Constitution and Article I, Section 9 of the Ohio Constitution. . . .  The Petitioner was denied the effective assistance of counsel in the pre-trial phase of his case as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Article I, sections 10 and 16 of the Ohio Constitution. *Strickland v. Washington*, 466 U.S. 668 (1984). . . .  Defense counsel (Ken Lieux) was aware of a grievance filed against him by the Petitioner on or about June 28, 1995 * * * [and] there existed a lack of confidence in the defense counsel [and] clear complaints of misconduct[.] * * * Counsel for the Petitioner did not attempt to withdraw[,] . . . leaving the defendant without trial counsel for a significant period of time[,] * * * [and there is] a possibility that confidential communications between Attorney Lieux and the Petitioner were passed on to the police.

5.     [T]he failure of defense counsel to adequately represent the Petitioner at the pre-trial, trial and mitigation phases of trial did not comply with minimum Constitutional standards of reliability required for the imposition of a death sentence under the Eighth and Fourteenth Amendments of the United States Constitution and Article I, Section 9 of the Ohio Constitution. . . .  The Petitioner was denied the effective assistance of counsel in the pre-trial phase of his case as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Article I, sections 10 and 16 of the Ohio Constitution. *Strickland v. Washington*, 466 U.S. 668 (1984). . . .  Petitioner's right to effective assistance of counsel was denied when defense counsel did not renew his Motion in Limine, and/or request an[] opportunity to voir dire Detective Leiby as to the whereabouts of Michael Smith, and/or ask for a continuance in order to secure the appearance of Michael Smith, and/or demand

14

the return of the fugitive Michael Smith, and/or request a bench warrant for Michael Smith. . . .  At the trial of the Petitioner's co-defendant, Danny Smith * * * [Michael Smith's] testimony was significantly different and more detailed than the testimony contained within his deposition, and acted to further disprove the existence of a plan or conspiracy to murder Ronald Lally in Lorain County * * * [Michael Smith] testified there was no plan that he knew of regarding the killing * * * Michael Smith as a live witness could aid and in fact refute any allegations of a plan or conspiracy as to [m]urder in Lorain County. . . . Petitioner's right to confront the witnesses against him, as guaranteed by the Sixth Amendment of the United States Constitution, was violated . . . .

6.      [T]he failure of defense counsel to adequately represent the Petitioner at the pre-trial, trial and mitigation phases of trial did not comply with minimum Constitutional standards of reliability required for the imposition of a death sentence under the Eighth and Fourteenth Amendments of the United States Constitution and Article I, Section 9 of the Ohio Constitution. . . .  The Petitioner was denied the effective assistance of counsel in the pre-trial phase of his case as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Article I, sections 10 and 16 of the Ohio Constitution. *Strickland v. Washington*, 466 U.S. 668 (1984). . . .  Petitioner was not afforded effective assistance of counsel when his trial counsel failed to make mandatory objections to the prosecutor's statements [at the penalty phase].  The jury was permitted to hear and accept as true absolutely improper instructions as to what evidence they could take under consideration and how said evidence was to be used in determining their recommendation. . . . Petitioner's counsel failed to object to the prosecutor's comments on Petitioner's unsworn testimony. The jury, as a result of the ineffective assistance of his counsel, were permitted to lessen the weight of Petitioner's statements.

7.      [T]he failure of defense counsel to adequately represent the Petitioner at the pre-trial, trial and mitigation phases of trial did not comply with minimum Constitutional standards of reliability required for the imposition of a death sentence under the Eighth and Fourteenth Amendments of the United States Constitution and Article I, Section 9 of the Ohio Constitution. . . .  The Petitioner was denied the effective assistance of counsel in the pre-trial phase of his case as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Article I, sections 10 and 16 of the Ohio Constitution. *Strickland v. Washington*, 466 U.S. 668 (1984). . . .  The Petitioner was denied effective assistance of counsel when his defense counsel failed to object to a jury instruction that indicated their decision regarding the sentence was only a recommendation . . . .

8.      [T]he failure of defense counsel to adequately represent the Petitioner at the pre-trial,

15

trial and mitigation phases of trial did not comply with minimum Constitutional standards of reliability required for the imposition of a death sentence under the Eighth and Fourteenth Amendments of the United States Constitution and Article I, Section 9 of the Ohio Constitution. . . .  The Petitioner was denied the effective assistance of counsel in the pre- trial phase of his case as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Article I, sections 10 and 16 of the Ohio Constitution.  *Strickland v. Washington*, 466 U.S. 668 (1984). . . .  The failure of defense counsel to adequately prepare for and represent the Petitioner at the penalty phase resulted in a sentence of death that does not comply with the minimum Constitutional standards of reliability as required for the imposition of a death sentence. . . .  Defense counsel did not file a motion and secure the services of a mitigation specialist until after the petitioner had been convicted of [a]ggravated [m]urder.

9.      The Petitioner's Sixth Amendment rights under the United States Constitution were violated when the State of Ohio offered the deposition of Michael Smith for the [j]ury's consideration, instead of calling him as a live witness.

10.     The Petitioner was denied his Constitutional right to be tried by a jury of his peers when he stood trial and was convicted in Lorain County, Ohio, after the trial court failed to grant his defense counsel's motion for [a]cquittal after the State rested it's [*sic*] case without making the requisite showing of venue. . . .  The Petitioner was denied his Sixth Amendment rights under the Constitution of the United States where he was convicted of a crime in a district other than where the crime was committed, and where the State failed to prove the necessary element of venue.

11.     The Petitioner's Constitutional right to equal protection under the law was violated when the prosecutor exercised two peremptory challenges in a racially discriminatory manner in violation of appellant's rights.

12.     The Petitioner was denied his Constitutional right under due process and equal protection when members of the Elyria Police Department and/or the Lorain County Prosecutor's office played a role in the "unavailability" of the witness Michael Smith. * * * As a result of these actions, the Petitioner was denied the constitutional right to face his accusers in open court . . . .

(ECF No. 44-3.)  The trial court dismissed Mr. Smith's petition without a hearing on June 29, 1998.

(ECF No. 122-8, 117-27.)

On July 29, 1998, Mr. Smith, now represented by Attorney Keith Yeazel, appealed the trial court's denial of his post-conviction petition to the Ninth District Court of Appeals.  (ECF No. 122-9, 11-12.)  He asserted the following four assignments of error:

I.      The trial court erred in failing to hold a hearing on Petitioner's claims, thus violating his rights under the Fifth, Sixth, Eighth, Ninth and Fourteenth amendments to the United States [Constitution], and Article I, Sections 1, 2, 9, 10, 16 and 20 of the Ohio Constitution.

II.     The trial court erred in failing to voluntarily recuse itself from presiding over Appellant's post conviction case in violation of his rights under the Fifth, Sixth, Eighth, Ninth and Fourteenth amendments to the United States [Constitution], and Article I, Sections 1, 2, 9, 10, 16 and 20 of the Ohio Constitution.

III.    The trial court erred in failing to afford Appellant the assistance of experts and discovery in violation of his rights under the Fifth, Sixth, Eighth, Ninth and Fourteenth amendments to the United States [Constitution], and Article I, Sections 1, 2, 9, 10, 16 and 20 of the Ohio Constitution.

IV.     The trial court erred in dismissing the petition because the state post-conviction scheme as applied offers an inadequate corrective process for the factual development, hearing and determination of claims of violation of state and federal constitutional guarantees.

(ECF No. 122-10, 2.)  The court of appeals affirmed the trial court's decision on March 15, 2000.

*State v. Smith*, No. 98CA007169, 2000 WL 277912 (Ohio Ct. App. March 15, 2000).

Mr. Smith timely appealed the court of appeals' decision to the Ohio Supreme Court.  (ECF No. 122-11, 3-4.)  He raised the following six propositions of law:

I.      A court of appeals decision holding that a post conviction petitioner "did not attempt to support any of his claims with evidence de hors the record" is clearly erroneous when [the] trial court specifically references such evidence de hors the record in its decision denying post conviction relief.

II.     A court of appeals decision holding that an assignment of error, contending that Ohio's [p]ost [c]onviction scheme as applied does not comport with federal constitutional due process and equal protection principles, presents a statutory rather than constitutional challenge is error.

III.    A trial court must hold an evidentiary hearing in a post conviction action if the petition: (1) contains a claim sufficient on its face to raise a constitutional issue; (2) the files and records of the case do not affirmatively disprove that the petitioner is entitled to relief; and (3) the claim relies upon evidence de hors the record.

17

IV.    A trial judge should voluntarily recuse himself from presiding over a criminal trial where his impartiality might reasonably be questioned.  A trial judge's impartiality might be reasonably questioned where the trial judge, as the ultimate sentencer, had cooperated with the State and the police by agreeing to grant shock probation to a key prosecution witness in exchange for the witness' testimony in a death penalty trial.

V.    A post conviction litigant is entitled to discovery and the assistance of experts to locate and obtain admissible evidence for his claims.

VI.    Absent a hearing, a post conviction petitioner in Ohio has no procedural vehicle by which he may develop the factual basis for his off-the-record constitutional claims.

(*Id*. at 6-7.)  The Ohio Supreme Court declined jurisdiction to hear the appeal on July 19, 2000.  *State v. Smith*, 89 Ohio St. 3d 1453, 731 N.E.2d 1140 (Ohio 2000) (Table).

### b.    second post-conviction petition

On March 15, 2000, Mr. Smith, still represented by Attorney Yeazel, filed a successive petition for post-conviction relief and complaint for declaratory judgment in the trial court.  The petition raised the following three claims for relief:

1.    Petitioner Smith's conviction is void or voidable because the State of Ohio, through the Lorain County Prosecuting Attorney's Office and witnesses John Homoki, Sandra Williams, Terry Hopkins, Sharon Hopkins, Corinne (JoAnn) Fike and Michael Smith, put on evidence it knew or should have known was false or let false testimony go uncorrected when the above-listed witnesses testified as outlined in the Summary Chart attached hereto as Exhibit A.

2.    Petitioner Smith's conviction is void or voidable because the State of Ohio through the Lorain County Prosecuting Attorney's Office and its agent City of Elyria Police Detective Alan Leiby engaged in a pattern and practice of using *ex parte* contacts with Lorain County Common Pleas Court judges to obtain grants of leniency for favored snitches and witnesses, and to ensure that persons with pending cases who were deemed uncooperative or those who were investigative targets obtained less favorable treatment including but not limited to, maximum, consecutive sentences.

3.    Petitioner Smith's conviction is void or voidable because the State of Ohio through the Lorain County Prosecuting Attorney's Office concealed, suppressed

18

and failed to disclose relevant, impeachment evidence in time for its effective
use at trial.

The petition sought declaratory relief finding Ohio's death penalty scheme unconstitutional on its face
and as applied to Mr. Smith.   (ECF No. 123-4, 12-99.)

On February 8, 2002, Mr. Smith, still represented by Attorney Yaezel, filed an amended
successor post-conviction petition, supplementing his petition with the following claim:

Trial counsel rendered ineffective assistance of counsel when they failed to challenge
the process of selecting venire persons to serve on petit juries in Lorain County, Ohio[,]
which was tainted due to the consideration of the factor of race in the drawing, and
selection of petit juries, in violation of the Sixth and Fourteenth Amendments to the
United States Constitution and corresponding sections of the Ohio Constitution.

(*Id*. at 153-202.)  Mr. Smith also filed that day a motion for leave to conduct discovery and a motion to
request funding to employ a jury composition expert.  (*Id*. at 102-52.)  The court denied Mr. Smith's
request for expert funding on March 1, 2002.  (*Id*. at 203.)

On July 1, 2004, the State of Ohio filed a motion to dismiss Mr. Smith's second post-
conviction petition.  (*Id*. at 229-34.)  On July 13, 2004, the trial court granted the State's motion and
dismissed Mr. Smith's second post-conviction petition, as well as the amendment to the second
petition and motion for additional discovery.  (*Id*. at 251-52.)

On August 9, 2006, Mr. Smith appealed that dismissal to the Ninth District Court of Appeals.
(ECF No. 123-5, 14.)  He presented the following three assignments of error:

I.      The trial court erred when it denied the claim for declaratory relief that [Ohio
Revised Code] § 2953.21(A)(2) is unconstitutional on its face and as applied to
Petitioner. . . .

II.     The trial court erred in failing to hold a hearing on Petitioner's claims, thus
violating his rights under the Fifth, Sixth, Eighth, Ninth and Fourteenth
Amendments to the United States, and Article I, Sections 1, 2, 9, 10, 16 and 20
of the Ohio Constitution. . . .

19

III.    The trial court erred in failing to afford Appellant the assistance of experts and discovery in violation of his rights under the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments to the United States, and Article I, Sections 1, 2, 9, 10, 16 and 20 of the Ohio Constitution.

(*Id*. at 39.)  On May 27, 2005, the court of appeals affirmed the trial court's decision.  (ECF No. 123-6, 35-44.)  On June 28, 2005, Mr. Smith appealed the court of appeals' decision to the Ohio Supreme Court, which declined jurisdiction to hear the case on October 12, 2005.  (ECF No. 123-7, 3-4, 48.)

### c.    *Murnahan* application

On March 7, 2001, Mr. Smith filed a motion in the Ninth District Court of Appeals seeking to have counsel appointed to represent him in filing an application to reopen his direct appeal in that court pursuant to Rule 26(B) of the Ohio Rules of Appellate Procedure and *State v. Murnahan*, 63 Ohio St. 3d 60, 584 N.E.2d 1204 (Ohio 1992).  (ECF No. 122-12, 5-17.)  The court denied the motion on March 20, 2001.  (*Id*. at 20.)  Mr. Smith appealed the denial of Rule 26(B) counsel to the Ohio Supreme Court on April 3, 2001.  (ECF No. 123-1, 3-12.)  The court declined jurisdiction to hear the appeal on June 27, 2001.  *State v. Smith*, 92 Ohio St. 3d 1428, 749 N.E.2d 756 (Ohio 2001) (Table).

Mr. Smith then filed his Rule 26(B) *Murnahan* application in the Ninth District Court of Appeals pro se, on July 17, 2001.  (ECF No. 123-2, 5-76.)  He presented five claims for relief in his application, as follows:

1.    The prosecutor's misconduct tainted the entire proceeding and deprived Mr. Smith of a fair and impartial trial.

2.    Mr. Smith was denied the effective assistance of counsel at trial.

3.    The trial court violated the mandatory provisions of Ohio Revised Code § 2929.03(F) and conducted an improper weighing at the sentencing phase.

4.    Ohio's death penalty scheme is unconstitutional.

a.    Ohio's proportionality and appropriateness review denies a defendant

20

due process and equal protection.

        b.      Ohio's post-conviction process fails to provide an adequate and effective corrective process for reviewing constitutional challenges to a conviction or sentence.

        c.      Electrocution is cruel and unusual punishment.

    5.      Mr. Smith was denied effective assistance of counsel on appeal.

(ECF No. 44-6.)

The court of appeals denied Mr. Smith's application on August 2, 2001.  (ECF No. 123-2, 103-04.)  On August 27, 2001, Mr. Smith filed a timely appeal of the appellate court's decision to the Ohio Supreme Court, as well as a motion to appoint counsel to represent him in that appeal.  (ECF No. 123-3, 3-16.)  The Ohio Supreme Court denied his request for counsel on September 26, 2001.  (ECF No. 123-3, 17.)  The court affirmed the court of appeals' denial of his application on May 1, 2002.  *State v. Smith*, 95 Ohio St. 3d 127, 766 N.E.2d 588 (Ohio 2002).  The United States Supreme Court denied certiorari on October 15, 2002.  *Smith v. Ohio*, 537 U.S. 951 (2002).

### d.      third post-conviction petition:  *Atkins* claim

On June 6, 2003, Mr. Smith, represented by Attorneys Jeffry Kelleher and Alan Rossman, filed a third successive post-conviction petition with the trial court, asserting that his sentence should be vacated under *Atkins v. Virginia*, 536 U.S. 304 (2002), because he is mentally retarded and therefore ineligible for execution, and requesting an evidentiary hearing and an independent expert to assist counsel. (ECF No. 123-4, 204-21.)  Concurrently, Mr. Smith filed a motion to appoint Attorneys Kelleher and Rossman as counsel for his *Atkins* claim.  (*Id*. at 222-28.)  On July 13, 2004, the court granted Mr. Smith's motion for appointment of counsel and appointed Attorney Kenneth Lieux to act as local counsel.  (*Id*. at 248.)  It also granted the State's motion for appointment of an independent

21

mental assessment of Mr. Smith. (*Id*. at 249.) On September 28, 2004, the trial court granted permission for Attorney Lieux to withdraw as counsel and appointed Attorney Rossman. (ECF No. 123-8, 12.) The trial court also granted Mr. Smith's request for a state-funded expert. (*Id*. at 33.)

A three-day hearing was held on Mr. Smith's *Atkins* claim, beginning on December 14, 2006, and ending on January 17, 2006. (*Id*. at 48, 49, 57.) On April 25, 2008, the trial court vacated Mr. Smith's death sentence on the ground that he is mentally retarded, and imposed a sentence of life imprisonment without the possibility of parole. (*Id*. at 96-124.)

Mr. Smith, represented by Attorney Kelleher, appealed the court's decision regarding his new sentence on May 30, 2008. (ECF No. 123-9, 3-4.) The State cross-appealed. (*Id*. at 10-11.) Mr. Smith filed a motion to dismiss the cross-appeal as untimely, which the court granted on July 16, 2008. (ECF No. 123-10, 18.) On October 1, 2008, the court dismissed the appeal pursuant to the parties' joint stipulation. (*Id*. at 45.)

### B.    Habeas Proceedings

Mr. Smith filed a Notice of Intention to File a Habeas Corpus Petition in this Court on August 2, 2000. (ECF No. 1). He also filed that day a Motion for the Appointment of Counsel and a Motion to Proceed In Forma Pauperis. (ECF Nos. 3 and 4, respectively.) The Court granted both motions (without waiving the filing fee) and appointed Alan Rossman and Jeffry Kelleher to represent Mr. Smith. (ECF Nos. 7 and 8.)

On January 11, 2001, Mr. Smith filed motions requesting funding for a private investigator and to conduct discovery. (ECF Nos. 22 and 23.) The Court denied the motion for discovery on February 23, 2001. (ECF No. 32.)

On October 11, 2001, Mr. Smith filed the Petition for a Writ of Habeas Corpus under 28

U.S.C. § 2254.  (ECF No. 44.)  He also filed a motion to stay his case in order to exhaust claims in state court.  (ECF No. 45.)  On November 21, 2001, he filed a request for leave to conduct discovery related to his Confrontation Clause, due process and prosecutorial misconduct claims; motion to expand the record with psychological records of Michael Smith; and ex parte motion requesting funding of a psychologist.  (ECF Nos. 57, 59, 60.)  On January 2, 2002, he filed a second request for leave to conduct discovery related to his proportionality review claim.  (ECF No. 68.)

Respondent filed a Return of Writ on January 4, 2002.  (ECF No. 71.)  On January 7, 2002, Mr. Smith filed a second motion to expand the record regarding his seventeenth and eighteenth claims for relief.  (ECF No. 72.)  On January 22, 2002, the Court stayed the case pending state-court proceedings.  (ECF No. 78.)  On April 28, 2004, Mr. Smith filed a motion for an order declaring his claims exhausted.  (ECF No. 92.)  The Court denied the motion on December 17, 2004.  (ECF No. 95.)  On May 23, 2005, the Court granted Mr. Smith's first motion to expand the record and denied without prejudice his first and second motions for leave to conduct discovery, motion for funds to employ a psychologist, and second motion to expand the record.  (ECF No. 99.)  On September 29, 2006, Mr. Smith moved to have his *Atkins* claim declared exhausted.  (ECF No. 101.)  The Court denied that motion, with leave to renew it.  (ECF No. 103.)  On June 9, 2008, the Federal Public Defender replaced Alan Rossman as Mr. Smith's counsel.[1]  (ECF No. 105.)

Mr. Smith moved to lift the stay based on his completion of state-court proceedings on January 28, 2009, which the Court granted on March 3, 2009.  (ECF No. 106.)  On November 16, 2009, Mr.

---

[1]     Attorney Rossman, who was then employed by the Federal Public Defender's Office, continued to represent Mr. Smith.

23

Smith dismissed several of his claims, primarily those related to his sentence.[2]  (ECF No. 109.)

That same day,  Mr. Smith requested certain discovery to support his claims based on the Confrontation Clause of the Sixth Amendment, prosecutorial misconduct, and the suppression of exculpatory and/or impeachment evidence relating to the unavailability at trial of a key witness for the prosecution, Mr. Smith's son Michael Smith, and the trial court's admission of Michael Smith's deposition into evidence.  (ECF No. 110.)  On April 27, 2010, the Court granted limited discovery related to Michael Smith's unavailability at trial, including the Lorain County Prosecutor's files for Mr. Smith's and his co-defendants' cases, Elyria Police Department documents, and depositions of the lead prosecutor and two detectives.  The Court denied Mr. Smith's request to obtain documents from the Lorain County Probation Department.  (ECF No. 113.)

Respondent refiled her Return of Writ with an Amended Appendix on October 17, 2012, after having also filed an updated Appendix.  (ECF Nos. 125 and 122-124, respectively.)  After requesting and receiving two extensions of time, Mr. Smith filed his Traverse on November 2, 2012.  (ECF No. 127.)  After requesting and receiving an extension of time, Respondent filed a Sur-Reply on January 7, 2013, rendering this matter ripe for disposition.  (ECF No. 131.)

## III.    Petitioner's Grounds for Relief

Mr. Smith now asserts ten grounds for relief.[3]  They are:

---

[2]    Specifically, Mr. Smith dismissed parts of his fourth and fifteenth grounds for relief, as well the eleventh, twelfth, thirteenth, seventeenth, twentieth, twenty-first, and twenty-second grounds.  (ECF No. 109.)

[3]    It appears that in addition to Mr. Smith's dismissal of several grounds for relief pursuant to his Notice of Dismissal filed on November 16, 2009 (ECF No. 109), Mr. Smith has abandoned several other grounds for relief because they are procedurally defaulted.  He omits any reference to his seventh, ninth, tenth, sixteenth, and eighteenth grounds for relief in his Traverse, and states, "Petitioner has attempted to narrow the scope of this Traverse to those

24

1.      The ineffective assistance of Petitioner's trial counsel with respect to the taking of the deposition of Michael Smith and the admission of the deposition at trial violated Petitioner's rights to the effective assistance of counsel at trial, and his right to be free from cruel and unusual punishment, as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments.

2.      The trial court's admission of the deposition of Michael Smith violated Petitioner's rights, including his right of confrontation and his right to be free from cruel and unusual punishment, as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments.

3.      The misconduct of the prosecutor with respect to the taking of the deposition of Michael Smith, the unavailability of Michael Smith to testify at Petitioner's trial and the introduction of the deposition at trial violated Petitioner's rights as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments.

4.      The numerous errors committed by the trial court violated Petitioner's right to due process, equal protection, a fair trial, the effective assistance of counsel at trial, and to be free from cruel and unusual punishment, as guaranteed by the First, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments.

5.      The acts and omissions of Petitioner's trial counsel before and during the culpability phase of Petitioner's trial deprived Petitioner of his rights to the effective assistance of counsel, due process of law, equal protection and to be free from cruel and unusual punishment, as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments.

6.      Petitioner was denied his right to a fair trial, due process of law, equal protection and to be free from cruel and unusual punishment, as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments, when the State withheld exculpatory *Brady*, *Napue*, and *Kyles* material.

8.      The Prosecutor's use of discriminatory peremptory challenges at Petitioner's trial violated Petitioner's right to a fair trial, equal protection, due process of law and to be free from cruel and unusual punishment, as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments.

14.     Petitioner's rights as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments were violated when the trial court failed to suppress and admitted Petitioner's statements to police as evidence at Petitioner's trial.

15.     Petitioner received the ineffective assistance of counsel on his direct appeal and was thereby deprived of his rights to equal protection, due process of law and to be free from cruel and unusual punishment, as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments.

---

claims that are either not procedurally defaulted, or for which there exist cause and prejudice to excuse any default."  (ECF No. 127, 1 n.1.)

19.     Because Ohio's post-conviction scheme, Ohio Rev. Code §§ 2953.21, *et seq.*, fails to provide an adequate and effective corrective process for reviewing constitutional challenges to a conviction or sentence, and because Ohio Rev. Code §§ 2952.23(A)(2) is facially unconstitutional and unconstitutional as applied to Petitioner, Petitioner was deprived of his rights to due process, equal protection, the effective assistance of counsel, and to be free from cruel and unusual punishment, as guaranteed by the First, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments.

(ECF No. 127, passim.)

## IV.     Standard of Review

Mr. Smith's Petition is governed by the Antiterrorism and Effective Death Penalty Act of 1996

("AEDPA"), since it was filed after the Act's effective date.  *Lindh v. Murphy*, 521 U.S. 320, 336

(1997); *Murphy v. Ohio,* 551 F.3d 485, 493 (6th Cir. 2009).  AEDPA, which amended 28 U.S.C. §

2254, was enacted "to reduce delays in the execution of state and federal criminal sentences,

particularly in capital cases, and 'to further the principles of comity, finality, and federalism.'"

*Woodford v. Garceau*, 538 U.S. 202, 206 (2003) (quoting (*Michael) Williams v. Taylor*, 529 U.S. 362,

436 (2000)).  As the United States Supreme Court recently explained, the Act "recognizes a

foundational principle of our federal system:  State courts are adequate forums for the vindication of

federal rights."  *Burt v. Titlow*, 134 S. Ct. 10, 15 (2013).  AEDPA, therefore, "erects a formidable

barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court."  *Id.*

One of AEDPA's most significant limitations on the federal courts' authority to issue writs of

habeas corpus is found in § 2254(d).  That provision forbids a federal court from granting habeas relief

with respect to a "claim that was adjudicated on the merits in State court proceedings" *unless* the state-

court decision either:

(1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

26

(2)      resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  Habeas courts review the "last *explained* state-court judgment" on the federal claim at issue.  *Ylst v. Nunnemaker*, 501 U.S. 797, 805 (1991) (emphasis original).

A state-court decision is contrary to "clearly established federal law" under § 2254(d)(1) only "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts."  *Williams*, 529 U.S. at 412-13.  "[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits."  *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011).  Even if the state court identifies the "correct governing legal principle," a federal habeas court may still grant the petition if the state court makes an "unreasonable application" of "that principle to the facts of the particular state prisoner's case."  *Id.* at 413.  A state-court decision also involves an unreasonable application if it unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.  *Id.* at 407.  As the Supreme Court has advised, "[t]he question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable – a substantially higher threshold."  *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams*, 529 U.S. at 410).

A state-court decision is an "unreasonable determination of the facts" under § 2254(d)(2) only if the court made a "clear factual error."  *Wiggins v. Smith,* 539 U.S. 510, 528-29 (2003).  Review under this clause, as its plain language indicates, also is limited to "the evidence presented in the State court proceeding."  Furthermore, the petitioner bears the burden of rebutting the state court's factual

27

findings "by clear and convincing evidence."  *Burt*, 134 S. Ct. at 15; *Rice v. White*, 660 F.3d 242, 250

(6th Cir. 2011).  This requirement mirrors the "presumption of correctness" AEDPA affords state-

court factual determinations, which only can be overcome by clear and convincing evidence.[4]  28

U.S.C.  § 2254(e)(1).  The Supreme Court repeatedly has declined to define the "precise relationship"

between § 2254(d)(2) and § 2254(e)(1).  *Burt*, 134 S. Ct. at 15; *see also Wood v. Allen*, 558 U.S. 290,

300 (2010).  It has explained, however, that it is

> incorrect . . ., when looking at the merits, to merge the independent requirements of §
> 2254(d)(2) and (e)(1).  AEDPA does not require a petitioner to prove that a decision is
> objectively unreasonable by clear and convincing evidence.  The clear and convincing
> evidence standard is found in § 2254(e)(1), but that subsection pertains only to state-
> court determinations of factual issues, rather than decisions.

*Miller-El v. Cockrell*, 537 U.S. 322, 341 (2003).  "[I]t is not enough for the petitioner to show some

unreasonable determination of fact; rather, the petitioner must show that the resulting state court

decision was 'based on' that unreasonable determination."  *Rice,* 660 F.3d at 250.  And, as the

Supreme Court has cautioned, "'a state-court factual determination is not unreasonable merely because

the federal habeas court would have reached a different conclusion in the first instance.'"  *Burt*, 134 S.

Ct. at 15 (quoting *Wood*, 558 U.S. at 301).

Indeed, the Supreme Court repeatedly has emphasized that § 2254(d), as amended by AEDPA,

is an intentionally demanding standard, affording great deference to state-court adjudications of

federal claims.  In *Harrington v. Richter*, 131 S. Ct. 770 (2011), the Supreme Court held that as long

as "fairminded jurists could disagree on the correctness of the state court's decision," then relief is

---

[4]     Section 2254(e)(1) provides:  "In a proceeding instituted by an application for a
write of habeas corpus by a person in custody pursuant to the judgment of a State court, a
determination of a factual issue made by a State court shall be presumed to be correct.  The
applicant shall have the burden of rebutting the presumption of correctness by clear and
convincing evidence."  28 U.S.C. § 2254(e)(1).

28

precluded under that provision.  *Id*. at 786 (internal quotation marks omitted).  The Court admonished

that a reviewing court may not "treat[] the reasonableness question as a test of its confidence in the

result it would reach under de novo review," and that "even a strong case for relief does not mean the

state court's contrary conclusion was unreasonable."  *Id*. at 785.  Rather, § 2254(d) "reflects the view

that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems" and

does not function as a "substitute for ordinary error correction through appeal."  *Id*. (internal quotation

marks omitted).  Thus, a petitioner "must show that the state court's ruling . . . was so lacking in

justification that there was an error well understood and comprehended in existing law beyond any

possibility for fairminded disagreement."  *Id*. at 786-87.  This is a very high standard, which the Court

readily acknowledges:  "If this standard is difficult to meet, that is because it is meant to be."  *Id.* at

786.

Nevertheless, the Supreme Court recognized in *Harrington* that AEDPA "stops short of

imposing a complete bar on federal court relitigation of claims already rejected in state proceedings."

*Id.* at 786.  "[E]ven in the context of federal habeas, deference does not imply abandonment or

abdication of judicial review.  Deference does not by definition preclude relief."  *Miller-El*, 537 U.S.

at 340.  Rather, "under AEDPA standards, a federal court can disagree with a state court's factual

determination and 'conclude the decision was unreasonable or that the factual premise was incorrect

by clear and convincing evidence.'"  *Baird v. Davis*, 388 F.3d 1110, 1123 (7th Cir. 2004) (quoting

*Miller-El*, 537 U.S. at 340) (Posner, J.).

Federal courts, therefore, retain statutory and constitutional authority, absent suspension of the

29

writ,[5] to remedy detentions by state authorities that violate federal law, as long as AEDPA's limitations are observed.  *Rice*, 660 F.3d at 251.  And the deference AEDPA demands is not required if those limitations do not apply.  Federal habeas courts may, for example, review de novo an exhausted federal claim that was not adjudicated on the merits in state court.  *See Hill v. Mitchell*, 400 F.3d 308, 313 (6th Cir. 2005).  They likewise may review de novo claims adjudicated on the merits in state court if the petitioner meets the criteria for one of § 2254(d)'s exceptions.  *See Wiggins,* 539 U.S. at 534 (performing de novo review under *Strickland*'s second prong because the state court unreasonably applied the law in resolving *Strickland*'s first prong); *Panetti v. Quarterman*, 551 U.S. 930, 948 (2007) (holding that the unreasonable application of *Ford* under § 2254(d)(1) permitted a plenary review of the "underlying [] claim . . . unencumbered by the deference AEDPA normally requires.").  *See also Rice*, 660 F.3d at 252 (citing *Henness v. Bagley*, 644 F.3d 308 (6th Cir. 2011), and *Smith v. Bradshaw*, 591 F.3d 517, 522, 525 (6th Cir. 2010) (each applying de novo review to federal habeas claims where none of the AEDPA limitations applied)).

## V.    Exhaustion and Procedural Default

In addition to § 2254(d)'s limitations, AEDPA precludes habeas review of some claims that have not been properly exhausted before the state courts, or were procedurally barred by the state courts.

### A.    Exhaustion

Section 2254(b)(1) provides that a federal court may not award habeas relief to an applicant in state custody "unless it appears that – the applicant has exhausted the remedies available in the courts

---

[5]      *See* U.S. Const. art. I, § 9 cl. 2 ("The Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it.").

of the State; or there is an absence of available State corrective process; or circumstances exist that render such process ineffective to protect the rights of the applicant."  28 U.S.C. § 2254(b)(1); *see also Rose v. Lundy*, 455 U.S. 509 (1982).  Thus, exhaustion is fulfilled once a state supreme court provides a convicted defendant an opportunity to review his or her claims on the merits.  *O'Sullivan v. Boerckel*, 526 U.S. 838 (1999).  If under state law there remains a remedy that a petitioner has not yet pursued, exhaustion has not occurred and the federal habeas court cannot entertain the merits of the claim.  *Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994).[6]

When a habeas court finds a claim to be unexhausted, it can, for good cause, stay the action and permit the petitioner to present his unexhausted claim to state court and then return to federal court for review of his perfected petition.  *Rhines v. Weber*, 544 U.S. 269, 277 (2005).  The court need not wait for exhaustion, however, if it determines that a return to state court would be futile.  *Lott v. Coyle*, 261 F.3d 594, 608 (6th Cir. 2001).  In addition, AEDPA's § 2254(b)(2) permits courts to deny unexhausted habeas claims on the merits where appropriate.  *See* 28 U.S.C. § 2254(b)(2); *Hanna v. Ishee,* 694 F.3d 596, 610 (6th Cir. 2012) (denying petitioner's claim on the merits "notwithstanding a failure to exhaust" the claim).

### B.  Procedural Default

Even where a state prisoner exhausts available state-court remedies, a federal court may not consider "contentions of general law which are not resolved on the merits in the state proceeding due to petitioner's failure to raise them as required by state procedure."  *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977).  If a "state prisoner has defaulted his federal claims in state court pursuant to an

---

[6] Under the *Perry* rule, however, Ohio courts are barred on grounds of *res judicata* from considering any issue that could have been, but was not, raised on direct appeal.  *State v. Perry*, 10 Ohio St. 2d 175, 226 N.E.2d 104 (Ohio 1967).

independent and adequate state procedural rule, federal habeas review of the claims is barred unless

the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged

violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental

miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).  To be independent, a state

procedural rule and the state courts' application of it "must rely in no part on federal law."

*Fautenberry v. Mitchell*, No. C-1-00-332, 2001 WL 1763438, at * 24 (S.D. Ohio Dec. 26, 2001)

(citing *Coleman*, 501 U.S. at 732-33).  To be adequate, a state procedural rule must be "'firmly

established and regularly followed'" by the state courts at the time it was applied.  *Beard v. Kindler*,

558 U.S. 53, 130 S. Ct 612, 618 (2009).  If a petitioner fails to fairly present any federal habeas claims

to the state courts but has no remaining state remedies, then the petitioner has procedurally defaulted

those claims.  *O'Sullivan v. Boerckel*, 526 U.S. at 848; *Rust v. Zent*, 17 F.3d at 160.

   In *Maupin v. Smith*, 785 F.2d 135 (6th Cir. 1986), the Sixth Circuit outlined the now familiar

test to be followed when the state argues that a habeas claim is defaulted because of a prisoner's

failure to observe a state procedural rule.  It is:

> First, the federal court must determine whether there is a state procedural rule that is
> applicable to the petitioner's claim and whether the petitioner failed to comply with that
> rule.  Second, the federal court must determine whether the state courts actually
> enforced the state procedural sanction -- that is, whether the state courts actually based
> their decisions on the procedural rule.  Third, the federal court must decide whether the
> state procedural rule is an adequate and independent state ground on which the state
> can rely to foreclose federal review of a federal constitutional claim. Fourth, if the
> federal court answers the first three questions in the affirmative, it would not review the
> petitioner's procedurally defaulted claim unless the petitioner can show cause for not
> following the procedural rule and that failure to review the claim would result in
> prejudice or a miscarriage of justice.

*Williams v. Coyle*, 260 F.3d 684, 693 (6th Cir. 2001) (citing *Maupin*, 785 F.2d at 138) (further

citations omitted).

In determining whether the *Maupin* factors are met, the federal court again looks to the last explained state-court judgment.  *Ylst v. Nunnemaker*, 501 U.S. 797, 805 (1991); *Combs v. Coyle*, 205 F.3d 269, 275 (6th Cir. 2000).  If the last state court rendering a reasoned opinion on a federal claim "clearly and expressly states that its judgment rests on a state procedural bar," then the claim is procedurally defaulted and barred from consideration on federal habeas review.[7]  *Harris v. Reed*, 489 U.S. 255, 263 (1989).  Conversely, if the last state court to be presented with a particular federal claim reaches the merits of that claim, then the procedural bar is removed and a federal habeas court may consider the merits of the claim in its review.  *Ylst*, 501 U.S. at 801.

If the three *Maupin* factors are met, the claim is procedurally defaulted.  However, the federal court may excuse the default and consider the claim on the merits if the petitioner demonstrates that (1) there was cause for him not to follow the procedural rule and that he was actually prejudiced by the alleged constitutional error, or (2) a fundamental miscarriage of justice would result from a bar on federal habeas review.  *Maupin*, 785 F.2d at 138; *Hutchison v. Bell*, 303 F.3d 720, 735 (6th Cir. 2002); *Combs*, 205 F.3d at 274-75.

A petitioner can establish cause in two ways.  First, a petitioner may "show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule."  *Murray v. Carrier*, 477 U.S. 478, 488 (1986); *Mohn v. Bock*, 208 F. Supp. 2d 796, 801 (E.D. Mich. 2002).  Objective impediments include an unavailable claim, or interference by officials that made

---

[7]     An exception to this rule lies where "the later state decision rests upon a prohibition against *further* state review," in which case the decision "neither rests upon procedural default nor lifts a pre-existing procedural default, [and] its effect upon the availability of federal habeas is nil . . . ."  *Ylst*, 501 U.S. at 804 n.3.  In that case, habeas courts "look through" that later decision to the prior reasoned state-court judgment.  *Id.* at 805 ("state rules against [a] superfluous recourse [of state habeas proceedings] have no bearing upon [a petitioner's] ability to raise the [federal] claim in federal court").

compliance impracticable.  *Murray*, 477 U.S. at 488; *Mohn*, 208 F. Supp. 2d at 801.  Second, constitutionally ineffective assistance of counsel constitutes cause.  *Murray*, 477 U.S. at 488-89; *Rust v. Zent*, 17 F.3d at 161; *Mohn*, 208 F. Supp. 2d at 804.

If a petitioner asserts ineffective assistance of counsel as cause for a default, that ineffective-assistance claim must itself be presented to the state courts as an independent claim before it may be used to establish cause.  *Murray*, 477 U.S. at 488-89.  If the ineffective-assistance claim is not presented to the state courts in the manner that state law requires, that claim is itself procedurally defaulted and can only be used as cause for the underlying defaulted claim if the petitioner demonstrates cause and prejudice with respect to the ineffective-assistance claim.  *Edwards v. Carpenter*, 529 U.S. 446, 452-53 (2000).

To establish prejudice, a petitioner must demonstrate that the constitutional error "worked to his actual and substantial disadvantage."  *Perkins v. LeCureux*, 58 F.3d 214, 219 (6th Cir. 1995) (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982)).  "When a petitioner fails to establish cause to excuse a procedural default, a court does not need to address the issue of prejudice."  *Simpson v. Jones*, 238 F.3d 399, 409 (6th Cir. 2000).

Because the cause and prejudice standard is not a perfect safeguard against fundamental miscarriages of justice, the Supreme Court has recognized a narrow exception to the cause requirement where a constitutional violation has "probably resulted" in the conviction of one who is "actually innocent" of the substantive offense.  *Dretke v. Haley*, 541 U.S. 386, 392 (2004) (citing *Murray*, 477 U.S. at 495-96).  When the Court extended this exception to claims of capital sentencing error, it limited the exception in the capital sentencing context to cases in which the petitioner could show "'by clear and convincing evidence that, but for constitutional error, no reasonable juror would

34

have found the petitioner eligible for the death penalty under the applicable state law.'" *Id.* (quoting *Sawyer v. Whitley*, 505 U.S. 333, 336 (1992)).

The Court will address the issues of exhaustion and procedural default presented in this case when it reviews Mr. Smith's individual claims.

**VI.    Analysis of Petitioner's Grounds for Relief**

    **A.    *First and Fifth Grounds for Relief:  Ineffective Assistance of Trial Counsel***

For his first and fifth grounds for relief, Mr. Smith claims that his trial counsel violated his Sixth Amendment right to effective assistance of counsel.  Specifically, he complains that counsel:

1.    was ineffective in his performance as it related to the deposition of Michael Smith (the "Smith deposition"), including:

    a.    failing to properly challenge the Smith deposition,

    b.    failing to prevent impermissible joinder of Mr. Smith and his co-defendants,

    c.    stipulating to the truth of Michael Smith's unsworn deposition testimony,

    d.    failing to prevent the prosecutor from interfering with the cross-examination of Michael Smith and other prosecutorial misconduct during the Smith deposition,

    e.    failing to object to testimony elicited during cross-examination for the co-defendants,

    f.    waiving numerous other objections that arose during the deposition,

    g.    failing to have Michael Smith's prior statement(s) to police made a part of the record,

    h.    failing to ensure verification of Michael Smith's deposition testimony,

    i.    failing to ensure that the Smith deposition was filed,

    j.    failing to follow up or act upon the revelations regarding Michael Smith's psychological problems and drug abuse before and during his deposition,

    k.    failing either to object to any portion of the Smith deposition or to move to

suppress all of part of the deposition,

l.     failing to prevent the admission of the Smith deposition at trial,

m.    failing to object to Det. Leiby's testimony regarding Mr. Smith's remarks at the end of the Smith deposition,

n.    failing to discover Det. Leiby's notes regarding the remark,

o.    failing to place Det. Leiby under oath and question him concerning a telephone conversation Det. Leiby had with Michael Smith,

p.    failing to assure that Michael Smith's psychiatric records from the Cleveland Psychiatric Institute were made a part of the record for appeal,

q.    failing to conduct an investigation of Michael Smith before trial,

r.    failing to request a continuance of the trial in order to secure the psychiatric records of Michael Smith before trial, and

s.    failing to request a continuance of the trial to locate Michael Smith;

2.    during the voir dire stage of trial, failed to:

a.    engage in a meaningful voir dire and

b.    object to the trial court excusing for cause two jurors;

3.    failed to object to the State's introduction of certain prejudicial evidence and to the trial court's admission of that evidence, including:

a.    State's Exhibit 4 (complete Lorain County Common Pleas Court file for Mr. Smith's 1993 indictment for aggravated drug trafficking),

b.    State's Exhibit 5 (similar file regarding Danny Smith's 1993 indictment for aggravated drug trafficking),

c.    State's Exhibit 6 (Elyria police report regarding Mr. Smith's arrest for the 1993 drug trafficking charge),

d.    State's Exhibit 7 (Elyria police report regarding Danny Smith's arrest for the 1993 drug trafficking charge),

e.    State's Exhibit 8 (September 15, 1993, Elyria police dispatcher's report),

36

      f.      State's Exhibit 9 (Mr. Lally's informant agreement with the police).

      g.      State's Exhibit 10 (tape recording of the "controlled buy" between Mr. Lally and the Smiths),

      h.      State's Exhibits 11A, B and C (tape recordings and transcriptions of Mr. Smith's statements to the police);

4.      during the culpability phase of trial, failed to object to:

      a.      prosecutor's misrepresentation to the jury regarding Michael Smith's whereabouts and

      b.      prosecutor's reference to Mr. Smith's criminal record, and

      c.      numerous instances of prosecutorial misconduct;

5.      regarding jury instructions, failed to request:

      a.      an "addict-informer" instruction,

      b.      an instruction limiting the Smith deposition,

      c.      an instruction limiting Det. Leiby's testimony regarding Mr. Smith's 1993 drug trafficking indictment, and

      d.      an instruction limiting Det. Leiby's testimony regarding Mr. Smith's prior criminal convictions, and

      e.      an instruction limiting the jury's consideration of "any of the errors noted above."

(ECF No. 44, 1-20, 55-62.)

## 1.    **Procedural Posture**

As will be demonstrated below, several of Mr. Smith's ineffective-assistance claims have not been presented to state court, and are therefore unexhausted. Mr. Smith argues that Respondent has waived the defense of exhaustion. (*See* ECF No. 127, 3.) Respondent counters that she did not waive the defense, but only argued earlier in these proceedings that the Court need not stay Mr. Smith's

habeas proceedings because he most likely will have exhausted his claims before the Court issued its final judgment.  (ECF No. 71, 30-35.)  The Court need not resolve this issue, however, because AEDPA's § 2254(b)(2) permits courts to deny unexhausted habeas claims on the merits where appropriate.  *See* 28 U.S.C. § 2254(b)(2); *Hanna v. Ishee,* 694 F.3d 596, 610 (6th Cir. 2012) (denying petitioner's claim on the merits "notwithstanding a failure to exhaust" the claim).

Respondent also argues that Mr. Smith's habeas claims of ineffective assistance of trial counsel "greatly exceed" the ineffective-assistance claims he properly presented in state court, and, therefore, are procedurally defaulted to the extent that they were not properly advanced on direct appeal or in post-conviction proceedings.  (ECF No. 131, 2-4, 26-27.)  Mr. Smith counters that none of his ineffective-assistance claims is defaulted because they either were properly presented to a state court, or, where the state courts found claims procedurally barred, the bar was misplaced and should not be recognized here.  He further argues that any barred claims can be excused by a showing of cause and prejudice.  (ECF No. 127, 3-8, 111-13.)

### a.  ineffective-assistance claims raised on direct appeal

Mr. Smith raised eight claims of ineffective assistance of trial counsel in his seventh proposition of law to the Ohio Supreme Court.  (ECF No. 122-5, 114-18.)  Of those claims, the following are identical or similar to his habeas ineffective-assistance claims:

    1.    Counsel failed to engage in a meaningful voir dire of prospective jurors, and in fact did not ask even one question of prospective juror Ellingsworth.  In numerous cases, defense counsel failed to object to improper questions.  (T. 91, 97).  Finally, counsel's entire line of questioning consisted merely of general inquiries regarding the jurors [sic] ability to be fair and impartial. . . .

    2.    Counsel failed to object to the numerous instances of prosecutorial misconduct, including prejudicial remarks in opening argument (T. 446) and in closing arguments.  (T. 790).

4.      Counsel failed to object to extensive testimony relating to the allegations, facts and circumstances surrounding the "underlying offense" which served as the basis for Lally being considered a witness in a criminal proceeding. . . .  Counsel was also ineffective in failing to request a limiting instruction as to the evidence.  (See, e.g.[,] T. 696).

5.      During the questioning of Alan Leiby, testimony was introduced relating to an alleged threat made by Raymond Smith to his son[] Michael Smith at Michael's deposition. . . .

Incredibly, Counsel did not object to this entire line of question [sic]. The admission of this testimony was totally irrelevant to the issues before the jury, and counsel's failure to object and to preserve the record constitutes ineffective assistance of counsel. . . .

6.      Counsel was ineffective when he failed to place Detective Leiby under oath and question him concerning a telephone conversation Leiby had with Michael Smith during the trial.  (T. 733.)  Further, counsel failed to request a continuance of the trial so efforts could be made to located [sic] Mr. Smith and/or request that the Court issue a warrant for his arrest.

7.      Counsel failed to ensure that evidence of Mr. Smith's prior convictions were not disclosed to the jury, such evidence being contained in the Court files that were also introduced into evidence and not properly objected to.  (T. 746).

(*Id.* at 114-18.)

Accordingly, sub-claims 1(m), (o), and (s); 2(a); 3(a)-(d), (f), and (g); 4(a) and (b); and 5(b)

and (c), as numbered above, were properly presented to state court and may be reviewed.  Any

ineffective-assistance claims Mr. Smith raised to the court of appeals on direct review but not to the

Ohio Supreme Court are procedurally defaulted.  *O'Sullivan v. Boerckel*, 526 U.S. 838, 847-48 (1999)

(holding that a claim is procedurally defaulted where the petitioner did not appeal the claim to the

state supreme court).

### b.      ineffective-assistance claims raised on post-conviction

Mr. Smith also raised several ineffective-assistance claims in his second amended petition in

his first post-conviction proceeding.  Among those claims, the only ones that he also has raised here

39

were included in his fifth claim of relief, in which he argued that his trial counsel failed "to renew the Motion in Limine and/or request an opportunity to voir dire Detective Leiby as to the whereabouts of Michael Smith, and/or ask for a continuance in order to secure the appearance of Michael Smith, and/or demand the return of the fugitive Michael Smith, and/or request a bench warrant for Michael Smith."  (ECF No. 122-7, 105.)   The trial court overruled this claim, however, on the ground that it was unsupported by the record or outside evidence, and barred by the doctrine of res judicata.  (ECF No. 122-8, 121-22.)

Mr. Smith appealed the ruling only on procedural grounds, such as the misapplication of res judicata and the failure to hold an evidentiary hearing and allow discovery.  The court of appeals affirmed the trial court's decision, and the Ohio Supreme Court declined jurisdiction.  *See State v. Smith*, 2000 WL 277912, at **1-2 (Ohio Ct. App. March 15, 2000); *State v. Smith*, 89 Ohio St. 3d 1453, 731 N.E.2d 1140 (Ohio 2000) (Table).

Mr. Smith advances three arguments that the court of appeals' dismissal of his ineffective-assistance claims was incorrect, and the claims were properly presented to the Ohio courts.  First, he contends that the appellate court's decision violated the rule announced in *State v. Cole*, 2 Ohio St. 3d 112, 443 N.E.2d 169 (1982), that res judicata does not apply when trial and appellate counsel are the same because of the lawyer's inherent conflict of interest.  (ECF No. 127, 4.)  Attorneys Bruner and Jordan were Mr. Smith's trial and appellate counsel.  However, the court reasoned that because Mr. Smith's ineffective-assistance claims dealt primarily with his original trial counsel, Attorney Lieux, who withdrew four months before trial and did not represent Mr. Smith on appeal, there was no conflict of interest.  The court also observed that Mr. Smith's appellate attorneys did raise some of his post-conviction ineffective-assistance claims on direct appeal.  *Smith*, 2000 WL 277912, at *2.  This

40

Court agrees.[8]

Mr. Smith next attacks the court of appeals' ruling on the ground that it was "premature because in July of the following year, Mr. Smith presented this claim to that court in an application to reopen his direct appeal."  (ECF No. 127, 4.)  This argument also fails.  As will be explained below, only claims of ineffective assistance of *appellate* counsel can be asserted in an application to reopen a direct appeal, or a *Murnahan* appeal; such appeals do not revive other claims underlying the ineffective-assistance claims.

Mr. Smith's third argument is that the court of appeals improperly applied res judicata to his ineffective-assistance claims because they were supported by evidence dehors the record.  (ECF No. 127, 5.)  He cites as support cases in which the Sixth Circuit declined to observe Ohio's procedural bar and instead proceeded to the merits of an ineffective-assistance claim when it concluded that Ohio improperly invoked the rule to bar post-conviction ineffective-assistance claims that were supported by evidence dehors the record.  *See Richey v. Bradshaw*, 498 F.3d 344, 359 (6th Cir. 2007); *Hill v. Mitchell*, 400 F.3d 308, 314 (6th Cir. 2005); and *Greer v. Mitchell*, 264 F.3d 663, 675 (6th Cir. 2001). Mr. Smith appears to argue that, as in those cases, the appellate court misapplied res judicata to his ineffective-assistance claim because Michael Smith's mental health records demonstrated that, had his trial counsel placed them in the record when he received them during trial, he could have persuaded the trial court to exclude the Smith deposition on confrontation and competency grounds.  (ECF No. 127, 5.)

---

[8] The Court does note, however, that the court of appeals was mistaken in its conclusion that "Smith has failed to demonstrate that he could not have raised each of his claims of ineffectiveness on appeal simply because one of the three attorneys who represented him in the trial court was also one of the two attorneys who represented him on appeal."  *Smith*, 2000 WL 277912, at *2.  Mr. Smith's only counsel at trial and on direct appeal were Attorneys Bruner and Jordan.

In the Sixth Circuit cases that Mr. Smith cites, however, the petitioners had presented to the court competent, relevant and material evidence *outside the record* to support their claims.  Here, Mr. Smith did not submit any evidence outside the record to support his ineffective-assistance claims.  In the fifth claim of relief in his second amended petition, he cited only to the trial transcript, which was part of the trial court record and which the court reviewed.  (*See* ECF No. 122-8, 122.)  There is no reference to Michael Smith's health records in the petition, and no such records were presented to the court.  Insofar as these claims are concerned, the court of appeals was correct in finding that Mr. Smith "did not attempt to support" them "with evidence *dehors* the record."  *Smith*, 2000 WL 277912, at *2.  This argument also is not well-taken.

### c.    ineffective-assistance claims raised in *Murnahan* application

Mr. Smith contends that he presented "most" of his habeas claims of ineffective assistance of trial counsel to the Ohio courts through his application to reopen his direct appeal of right under Ohio Civil Rule 26(B), or *Murnahan* application, including all of the claims relating to the Smith deposition.  (ECF No. 127, 6-8, 112-13.)  Respondent correctly points to *White v. Mitchell*, 431 F.3d 517 (6th Cir. 2005), in which the Sixth Circuit expressly rejected Mr. Smith's argument in the context of exhaustion.  It held that the petitioner's claim regarding peremptory challenges of potential jurors and his ineffective-assistance-of-appellate-counsel claim "are analytically distinct," and a *Murnahan* application "cannot function to preserve the peremptory challenge argument."  *Id*. at 526 (citing *Prather v. Rees*, 822 F.2d 1418, 1421 (6th Cir. 1987) (where difference between two similar claims is difference in legal theory, exhaustion of one claim is not sufficient to find exhaustion of other claim).  *See also Abshear v. Moore*, 546 F. Supp. 2d 530, 541 (S.D. Ohio 2008) ("Because claims of ineffective assistance of appellate counsel are based on a different legal theory from the underlying

claims, . . . [a *Murnahan*] application does not preserve the underlying claims from default.").  Mr. Smith's claims of ineffective assistance of trial counsel, therefore, are distinct from his claims regarding his appellate counsel, even if they serve as the basis for those claims.  Once the Ohio Supreme Court rejected his *Murnahan* application, therefore, that appeal does not preserve the underlying ineffective-assistance-of-*trial-* counsel claims used in it to prove ineffectiveness of *appellate* counsel.

**d.  conclusion**

Thus, sub-claims 1(m), (o), and (s); 2(a); 3(a)-(d), (f), and (g); 4(a) and (b); and 5(b) and (c), as numbered above, were properly presented to state court and are therefore ripe for review.  The ineffective-assistance sub-claims Mr. Smith raised in his first post-conviction proceeding are procedurally defaulted, because the state courts found them barred by the doctrine of res judicata.  *See supra* Part VI.A.2.  The remaining sub-claims are procedurally defaulted because they were never presented to the Ohio Supreme Court.  *See Wainwright v. Sykes*, 433 U.S. 72 (1977); *Murray v. Carrier*, 477 U.S. 478 (1986); *Mapes v. Coyle*, 171 F.3d 408, 413 (6th Cir. 1999) (all holding that failure to raise a constitutional issue on direct appeal constitutes procedural default).[9]

**2.  Merits**

Even if all of Mr. Smith's claims of ineffective assistance of counsel were ripe for review, they lack merit.  To succeed on a claim of ineffective assistance of counsel, a petitioner must satisfy the

---

[9]  Mr. Smith does not attempt to overcome this procedural bar by demonstrating cause and prejudice other than a passing reference to his fifteenth claim for relief of ineffective assistance of appellate counsel.  (*See* ECF No. 127, 113 ("Accordingly, the majority of Mr. Smith's claims are not defaulted and he has shown cause and prejudice for any that the Warden argues were subject to a procedural bar.  *See* Fifteenth Claim for Relief, below.").)  Because the Court finds that claim meritless, the procedural default of Mr. Smith's sub-claims for ineffective assistance of trial counsel is not excused on that basis.

two-prong test announced in *Strickland v. Washington*, 466 U.S. 668 (1984).  First, the petitioner must demonstrate that counsel's errors were so egregious that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  *Id* at 687.  To determine if counsel's performance was "deficient" pursuant to *Strickland*, a reviewing court must find that the representation fell "below an objective standard of reasonableness."  *Id.* at 688.  It must "reconstruct the circumstances of counsel's challenged conduct" and "evaluate the conduct from counsel's perspective at the time."  *Id.* at 689.

Second, the petitioner must show that he or she was prejudiced by counsel's errors.  To do this, a petitioner must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id.* at 694.  "It is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.'"  *Id*. at 693 (citation omitted).  Counsel's  errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."  *Id*. at 687.

If a petitioner fails to prove either deficiency or prejudice, his ineffective-assistance claim will fail.  *See Lundgren v. Mitchell*, 440 F.3d 754, 770 (6th Cir. 2006) (citing *Strickland*, 466 U.S. at 697).  The Supreme Court recently explained, "Surmounting *Strickland*'s high bar is never an easy task. . . . An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the *Strickland* standard must be applied with scrupulous care, lest intrusive post-trial inquiry threaten the integrity of the very adversary process the right to counsel is meant to serve."  *Harrington v. Richter,* 131 S. Ct. 770, 788 (2011) (citations and internal quotation marks omitted).

Thus, as the Supreme Court often has repeated, "[j]udicial scrutiny of a counsel's performance must be highly deferential" and "every effort [must] be made to eliminate the distorting effects of hindsight . . . ." *Strickland*, 466 U.S. at 689.  The Court recently emphasized, "*Strickland* specifically commands that a court 'must indulge [the] strong presumption' that counsel 'made all significant decisions in the exercise of reasonable professional judgment,'" recognizing "the constitutionally protected independence of counsel and . . . the wide latitude counsel must have in making tactical decisions." *Cullen v. Pinholster*, 131 S. Ct. 1388, 1406-07 (2011) (quoting *Strickland*, 466 U.S. at 689-90).

Under AEDPA, a habeas court is limited to determining whether a state-court decision regarding an ineffective-assistance claim was contrary to, or an unreasonable application of, clearly established federal law.  28 U.S.C. § 2254(d)(1); *Mitchell v. Mason*, 325 F.3d 732, 737-38 (6th Cir. 2003) (holding ineffective assistance of counsel is mixed question of law and fact to which the unreasonable application prong of § 2254(d)(1) applies).  The Supreme Court recently observed that the standards imposed by *Strickland* and § 2254(d) are both "highly deferential," so that in applying them together, "review is 'doubly' so." *Harrington*, 131 S. Ct. at 788.  Therefore, "the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Id.*

### a.  taking and admission of Smith deposition

Mr. Smith asserts numerous claims of ineffective assistance related to the taking and admission of his son Michael's deposition.  (ECF No. 127, 25-43.)  He presented only two of these arguments to the Ohio Supreme Court:  that his counsel was deficient for failing to object to Det. Leiby's testimony regarding Mr. Smith's remarks at the end of the deposition; and for failing to question Det. Leiby at

45

trial about a telephone conversation he had had with Michael.  (ECF No. 122-5, 42-46.)  The court

first found, in regards to Mr. Smith's ineffective-assistance claims as a whole, that "in no instance

does appellant demonstrate prejudice, 'a reasonable probability that, were it not for counsel's errors,

the results of the trial would have been different.'"  *Smith*, 87 Ohio St. 3d at 439, 721 N.E.2d at 110

(citation omitted).  The court also rejected the two specific claims at issue here, reasoning:

> Appellant asserts that he was prejudiced by counsel's failure to object (1) to
> Leiby's testimony concerning appellant's alleged "kill" remark at the end of Michael's
> deposition, and (2) to Deputy Drozdowski's rebuttal testimony. Neither assertion is
> persuasive. Counsel appears to have refrained from objecting in order to present a
> witness who discounted Leiby's (and later Drozdowski's) testimony that appellant
> threatened to kill Michael at the close of his deposition. Such a trial strategy, even if
> questionable, does not compel a finding of ineffective assistance of counsel. See *State
> v. Clayton* (1980), 62 Ohio St.2d 45, 49, 16 O.O.3d 35, 37, 402 N.E.2d 1189, 1192.

> Counsel's failure to recall Leiby for further questioning concerning a
> conversation he had with Michael Smith while the trial was ongoing did not constitute
> ineffective assistance. The court had already conducted a hearing concerning the
> availability of Michael as an in-court witness, and the court declared that it would
> require Michael's appearance if he was found. A request for a continuance would not
> have been granted, since the trial court was aware of the phone conversation between
> Leiby and Michael, and was aware that Michael was out of state and was hesitant to
> come back to Ohio because of pending arrest warrants for his probation violations.

*Id.* at 440-41, 721 N.E.2d at 111.  This Court finds the Ohio court's decision regarding these claims is

neither contrary to, nor an unreasonable application of, *Strickland*.

The Court reviews Mr. Smith's remaining ineffective-assistance sub-claims related to the

Smith deposition de novo.  These claims lack merit for the simple reason that Mr. Smith has not

shown any prejudice resulting from the deposition's admission.  To do so, he would have to

demonstrate "a reasonable probability" that if counsel had performed better, *either* Michael would

have been proven incompetent to testify in person or by deposition; *or* Michael would have been

found *and* available to testify, *and* he either would have been entirely discredited on cross-

examination or he would have completely changed his testimony to support his father's defense.  Mr. Smith concedes, however, that "it is conjecture" that counsel's further investigation into Michael's mental health would have established his incompetency to testify.  (ECF No. 127, 31.)  And Mr. Smith makes no showing at all, other than conclusory statements, that Michael's live testimony would have been so different from his deposition testimony that it would have changed the result of the trial.  In fact, Michael Smith did testify at Stanley Jalowiec's trial, and his account of the events surrounding Mr. Lally's murder was essentially the same as his deposition testimony.  *See Jalowiec v. Bradshaw*, 657 F.3d 293, 299-300 (6th Cir. 2011).  These claims are purely speculative.

> **b.**     **voir dire**

Mr. Smith also contends that his trial counsel erred in their performance during the voir dire phase of his trial.  His entire argument is this:

> Trial counsel failed to object to the trial court's excusing for cause of jurors Ellingsworth and Gosslein, and failed to assert that the defendant had a statutory and protected liberty interest in *Witherspoon* challenges.  These two jurors would not have been permitted to be excused under *Witherspoon*.  Counsel failed to ask this juror even one question, (Tr. 91-97), and failed to engage this juror and others in any meaningful voir dire.  Rather, the voir dire consisted of general, meaningless, rhetorical inquiries as to their ability to be fair and impartial.

(ECF No. 44, 57.)  The Ohio Supreme Court addressed this claim, stating:

> Appellant first complains that trial counsel failed to engage in meaningful voir dire. Specifically, appellant alleges that counsel failed to ask even one question of prospective juror Ellingsworth, and that counsel failed to object to improper questions on two occasions. Appellant further complains that trial counsel's line of questioning consisted merely of general inquiries. However, none of appellant's claims amounts to ineffective assistance.

> A review of the voir dire of Ellingsworth indicates that she would not and could not impose a death sentence. Any attempt by defense counsel to rehabilitate Ellingsworth would have probably been a waste of time. Counsel was wise to concentrate rehabilitative efforts on other prospective jurors who were more open-minded.

47

The two instances cited where counsel failed to object to improper questions do not indicate prejudice to appellant. In fact, the first instance cited by appellant involved questions from defense counsel, not the prosecutor. The second instance cited as an improper question did not prejudice appellant, since that prospective juror (Gosselin) was going to be excused for cause based on her inconsistent answers during voir dire. Nor did defense counsel's line of questioning amount to ineffective assistance. "The conduct of voir dire by defense counsel does not have to take a particular form, nor do specific questions have to be asked." *State v. Evans* (1992), 63 Ohio St.3d 231, 247, 586 N.E.2d 1042, 1056. Examination of the entire voir dire indicates no deficient performance on the part of defense counsel.

*Smith*, 87 Ohio St. 3d at 439-40, 721 N.E.2d at 110-11.

This Court does not consider the Ohio Supreme Court's conclusion to be contrary to, or an unreasonable application of, *Strickland*. The failure to ask potential jurors life-qualifying questions is not per se ineffective assistance of counsel. In *Witherspoon v. Illinois,* 391 U.S. 510 (1968), the Supreme Court held that it was permissible to ask prospective jurors about their views concerning the death penalty during voir dire in capital cases. These "death-qualifying" questions would ensure the impartiality of jurors by allowing the State to properly exercise challenges for cause against potential jurors unwilling to return a capital sentence. *Id*. at 520-23. In *Morgan v. Illinois*, 504 U.S. 719 (1992), the Supreme Court determined that defense counsel had the same ability to identify those jurors who would always impose the death penalty. *Morgan* held that "on voir dire the court must, on defendant's request, inquire into the prospective jurors' views on capital punishment," because a prospective juror who would always impose the death penalty must not be empaneled. *Id*. at 726. It declared, "If even one such juror is empaneled and the death sentence is imposed, the State is disentitled to execute the sentence." *Id*. at 729. However, as the Sixth Circuit has explained, "*Morgan* does not mandate that life-qualifying questions be asked of potential jurors in every case. Instead, *Morgan* holds that a defendant has the right to life-qualify his jury upon request." *Stanford v. Parker,*

48

266 F.3d 442, 454 (6th Cir. 2001).  Indeed, the Sixth Circuit has observed that "[c]ounsel is accorded particular deference when conducting voir dire.  An attorney's actions during voir dire are considered to be matters of trial strategy."  *Hughes v. United States*, 258 F.3d 453, 457 (6th Cir. 2001).

In this case, Mr. Smith has not set forth any evidence to rebut the presumption that his trial counsel conducted voir dire in a reasonable manner in accordance with trial strategy.  Moreover, he also has not demonstrated why Jurors Ellingsworth and Gosselin should not have been excused for cause under *Witherspoon.*  In fact, as the Ohio Supreme Court noted, Attorney Bruner did question Juror Gosselin extensively, as did the trial court.  He also objected when the court excused her, and the trial court explained that its ruling was based on the juror's inconsistent answers regarding the death penalty.  (ECF No. 70, 89-92, 94-99.)  As to Juror Ellingsworth, the prosecutor and trial court questioned her thoroughly and her opposition to the death penalty was clear.  Mr. Smith cannot show that further questioning by defense counsel would have altered her view or the ruling.  (*Id*. at 66-71.)  This claim is meritless.

### c.      introduction and admission of prejudicial evidence

For these sub-claims, Mr. Smith complains that his trial counsel failed to object to the State's introduction of certain prejudicial evidence and to the trial court's admission of that evidence.  This evidence includes: the complete Lorain County Common Pleas Court file for Mr. Smith's 1993 indictment for aggravated drug trafficking; the same file regarding Danny Smith's 1993 indictment for aggravated drug trafficking; the Elyria police report regarding Mr. Smith's arrest for the 1993 drug trafficking charge; the Elyria police report regarding Danny Smith's arrest for the 1993 drug trafficking charge; the September 15, 1993, Elyria police dispatcher's report; Mr. Lally's informant agreement with the police; the tape recording of the "controlled buy" between Mr. Lally and the

Smiths; and tape recordings and transcriptions of Mr. Smith's statements to the police.  (ECF No. 44, 58.)

The Ohio Supreme Court considered this claim with respect to Mr. Smith and Danny Smith's prior criminal record and, in particular, the underlying 1993 drug trafficking charge.  It observed:

> Nor was counsel ineffective for failing to ensure that appellant's prior convictions were not disclosed to the jury. The death penalty specification alleged that appellant killed a witness to prevent his testimony at another criminal proceeding. The court file for that proceeding was a necessary piece of evidence to prove the death penalty specification. Within the file was information that appellant had several prior convictions. However counsel, as part of his trial strategy, used the knowledge of appellant's prior convictions to argue that appellant may have been involved with drugs, but he was not a murderer. As we held in *Clayton*, *supra*, 62 Ohio St.2d at 49, 16 O.O.3d at 37–38, 402 N.E.2d at 1192, even if such strategy was questionable, deference to counsel's judgment is appropriate.

*Smith*, 87 Ohio St. 3d at 441, 721 N.E.2d at 111-12.  This decision is a reasonable application of *Strickland*.  Tactical decisions governing the admission of evidence are central to trial strategy. Therefore, as noted above, a petitioner claiming ineffective counsel must show that his or her counsel's actions were not supported by a reasonable strategy.  *Strickland*, 466 U.S. at 689.  Mr. Smith has not met that burden concerning the introduction of this evidence.

As to the remaining evidence Mr. Smith complains of – namely, the dispatcher's report concerning Danny Smith and Mr. Lally's confrontation and Mr. Smith's statements to police – Mr. Smith provides no argument or support demonstrating his counsel's deficient performance or resulting prejudice, and these claims also are meritless.  *See United States v. Crosgrove,* 637 F.3d 646, 663 (6th Cir. 2011) ("Because there is no developed argumentation in these claims, the panel declines to address Cosgrove's general assertions of misconduct in witness questioning and closing statements."); *United States v. Hall*, 549 F.3d 1033, 1042 (6th Cir. 2008) ("'[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed

waived.'") (quoting *United States v. Johnson*, 440 F.3d 832, 846 (6th Cir. 2006)).

### d.      failure to object to prosecutorial misconduct

Mr. Smith also complains that his counsel were ineffective for failing to object to numerous instances of prosecutorial misconduct, including the prosecutor's misrepresentation to the jury regarding Michael Smith's whereabouts, the prosecutor's references to Mr. Smith's criminal record, and "numerous instances of prosecutorial misconduct" described in his third ground for relief.  (ECF No. 44, 59-61.)  The Ohio Supreme Court addressed the two particular comments of the prosecutor to which Mr. Smith argued his counsel should have objected.  It concluded:

> Appellant next asserts that defense counsel failed to object to numerous instances of prosecutorial misconduct, including prejudicial remarks in opening and closing argument. The first instance, where the prosecutor stated, "Now, as a result of the fact that this group of people [the co-defendants] had been known to kill all those that are testifying against them * * *," should have been objected to, but did not prejudice appellant. The comment was overly embellished, but retained a grain of truth in that all the co-defendants were charged with killing Lally to prevent his testimony in another proceeding. The prosecutorial comments in closing argument appear to be a proper rebuttal to defense counsel's characterization of testimony that took place during trial.

*Smith*, 87 Ohio St. 3d at 440, 721 N.E.2d at 111.  This decision is not an unreasonable application of, or contrary to, *Strickland*.

Mr. Smith's remaining ineffective-assistance claims based on prosecutorial misconduct also fail.  As explained below, the Court finds no merit in Mr. Smith's claims of prosecutorial misconduct in his third ground for relief, and therefore does not find ineffective assistance of counsel based on the failure to object to such conduct.

### e.      jury instructions

For these sub-claims, Mr. Smith contends that his counsel were ineffective for failing to request certain jury instructions, such as an "addict-informer" instruction, and instructions limiting the

Smith deposition, Det. Leiby's testimony regarding the underlying drug offense and Mr. Smith's prior

criminal record, and the jury's consideration of "any of the errors noted above."  (ECF No. 44, 60-61.)

Mr. Smith presented his claim to the Ohio Supreme Court regarding the jury instruction

limiting Det. Leiby's testimony regarding Mr. Smith's drug offense about which Mr. Lally was to

testify, but the court did not directly address it.  The court did conclude, however, that "Leiby's

testimony was relevant and probative of appellant's motive in committing the crime and in proving the

death penalty specification."  *Smith*, 87 Ohio St. 3d at 440, 721 N.E.2d at 111.  It also rejected Mr.

Smith's argument that the trial court erred in not giving a limiting instruction concerning Det. Leiby's

testimony because "Leiby's testimony as to the underlying offense was necessary to show that Lally

was murdered to prevent his testimony against both appellant and Danny in the underlying drug

trafficking cases.  Thus, it was relevant to prove and support the death penalty specification . . . ."  *Id.*

at 437, 721 N.E.2d at 108.  The Court agrees that Det. Leiby's testimony was relevant, and therefore

finds no deficiency in counsel's failure to request a limiting instruction when the trial court most likely

would have denied such a request on that ground.

Similarly, the Court finds no deficiency in the fact that counsel did not request a jury

instruction limiting the portion Det. Leiby's testimony that referenced Mr. Smith's prior criminal

behavior.  As noted above, the Ohio Supreme Court held that Mr. Smith's counsel was not ineffective

for failing to ensure that Mr. Smith's prior convictions were not disclosed to the jury.  It observed that

counsel, as part of his trial strategy, used the knowledge of Mr. Smith's criminal record to argue that

although Mr. Smith may have been involved with drugs, he was not a murderer.  *Id.* at 441, 721

N.E.2d at 111-12.  It follows, then, that requesting a jury instruction limiting this testimony would

have been futile and does not amount to ineffective assistance of counsel.

52

Mr. Smith's remaining ineffective-assistance claims related to jury instructions – those concerning an "addict-informer" instruction, limiting instructions regarding the Smith deposition, and limiting instructions "as to any of the errors noted above" – also fail.  Mr. Smith has not provided any argument whatsoever to show that these claims meet the *Strickland* standard, either that counsel was unconstitutionally deficient or that he suffered any prejudice.  These sub-claims, therefore, are waived.

>        **f.        conclusion**

Accordingly, this Court concludes that to the extent the Ohio Supreme Court ruled on Mr. Smith's ineffective-assistance claims, its findings were neither an unreasonable application of, nor contrary to, *Strickland*.  As to the remaining claims, it finds that Mr. Smith's trial counsel did not perform so deficiently that there was a reasonable probability that the jury would have returned a different verdict.

> **B.      *Second, Fourth, and Fourteenth Grounds for Relief:  Trial Court Error***

Mr. Smith argues in his second, fourth and fourteenth grounds for relief that the trial court deprived him of a fair trial, in violation of his constitutional rights.  Specifically, he claims that the trial court erred by:

1.       allowing the Smith deposition to be taken and admitting it into evidence;

2.       failing to suppress Mr. Smith's statements to the police;

3.       trying the case to a tainted jury;

4.       not dismissing all charges against Mr. Smith for insufficient evidence relating to the following elements of aggravated homicide:

> a.       venue of the trial court,

> b.       prior calculation and design, and

> c.       Mr. Lally's cause of death;

53

5.      admitting inadmissable statements of Danny Smith, including:

      a.      Danny Smith's September 15, 1993 statements to Officer Homoki,

      b.      Danny Smith's September 7, 1993 statements to Sandra Williams,

      c.      Danny Smith's statements to Terry Hopkins months before the murder,

      d.      Danny Smith's statements to Terry Hopkins before the murder,

      e.      Danny Smith's statements to Terry Hopkins the morning of the murder, and

      f.      Danny Smith's April 28, 1994 and January 7, 1995 statements to Det. Leiby;

6.      admitting prejudicial, inadmissible evidence, including:

      a.      State's Exhibit 4 (complete Lorain County Common Pleas Court file for Mr. Smith's 1993 indictment for aggravated drug trafficking),

      b.      State's Exhibit 5 (similar file regarding Danny Smith's 1993 indictment for aggravated drug trafficking),

      c.      State's Exhibit 6 (Elyria police report regarding Mr. Smith's arrest for the 1993 drug trafficking charge),

      d.      State's Exhibit 7 (Elyria police report regarding Danny Smith's arrest for the 1993 drug trafficking charge),

      e.      State's Exhibit 8 (September 15, 1993, Elyria police dispatcher's report),

      f.      State's Exhibit 9 (Mr. Lally's informant agreement with the police), and

      g.      State's Exhibit 10 (tape recording of the "controlled buy" between Mr. Lally and the Smiths);

7.      permitting the jury to consider evidence of Mr. Smith's prior criminal record;

8.      permitting the following false and misleading arguments by prosecutor:

      a.      evidence and arguments that Mr. Smith had a prior conviction for aggravated drug trafficking,

      b.      other evidence and arguments that Mr. Smith was engaged in prior offenses of aggravated drug trafficking, and

      c.     arguments that Mr. Smith probably had Michael killed to prevent his testimony;

9.     failing to give limiting or curative jury instructions.

(ECF No. 44, 20-22; 34-55; 94-97.)

### 1.    Procedural Posture

Respondent concedes that Mr. Smith raised sub-claim 1 (asserted in his second ground for relief) and sub-claims 4(a) and 5(a) through (e) (asserted in his fourth ground for relief) to the Ohio Supreme Court, and they are therefore ripe for habeas review.[10]  She argues, however, that the remaining sub-claims to Mr. Smith's fourth ground for relief are procedurally defaulted: sub-claims 2 (also Mr. Smith's fourteenth ground for relief) and 4(b) were raised to the court of appeals, but were never presented to the Ohio Supreme Court; 8(b) and (c) were raised to the Ohio Supreme Court but reviewed only for plain error;[11] and the rest because they were never presented to the Ohio Supreme Court.  (ECF No. 71, 64-66.)

Mr. Smith does not address the issue of procedural default of his fourth ground for relief at all.  (*See* ECF No. 127, 110.)  He concedes in his Traverse, however, that his fourteenth ground for relief (sub-claim 2 as enumerated above), based on the trial court's failure to suppress Mr. Smith's statements to police, is unexhausted and abandons it.  (*Id*. at 137-38.)

---

[10]    Respondent argues, however, that one sub-claim related to the Smith deposition – the trial court's error in "joining" Mr. Smith with his co-defendants at the deposition – was never presented to the Ohio Supreme Court and is procedurally defaulted.  (ECF No. 127, 65.)  The Court agrees.  (*See* ECF No. 122-5, 87-88.)

[11]    Ohio courts may conduct a "plain error review" of procedurally defaulted claims in some cases.  *See, e.g., State v. Long*, 53 Ohio St. 2d 91, 95, 372 N.E.2d 804, 807 (Ohio 1978) (citing *United States v. Rudinsky*, 439 F.2d 1074, 1076 (6th Cir. 1971) (noting that the plain error rule is invoked "only in exceptional circumstances to avoid a miscarriage of justice").  That type of review, however, does not qualify as an "adjudication on the merits" for purposes of § 2254(d).  *See, e.g., Seymour v. Walker*, 224 F.3d 542, 557 (6th Cir. 2000).

The Court finds that Mr. Smith's sub-claim 1 of his second ground for relief and sub-claims 4(a) and 5(a) through (e) of his fourth ground for relief are preserved for habeas review.  The remaining sub-claims are procedurally defaulted.[12]

### 2.    Merits

### a.    authorizing and admitting Smith deposition

In his second and fourth grounds for relief, Mr. Smith argues that the trial court deprived him of a fair trial when it permitted, and then admitted, his son Michael's deposition, violating in particular his Sixth Amendment right to confront a witness.  Specifically, he argues that the court erred by granting the State's motion to take Michael's deposition to preserve his testimony when the State failed to show that it was probable that Michael would be unable to attend Mr. Smith's trial.  The trial court also erred, he claims, when it allowed the impermissible "joinder" of Mr. Smith's co-defendants in participating in the deposition.  And the court should have granted Mr. Smith's motion in limine to exclude the Smith deposition, because the State failed to show that it had made a reasonable, good faith effort to secure Michael's attendance at trial or that the deposition carried any "indicia of reliability."  Instead, Mr. Smith maintains, the trial court wrongfully admitted the full deposition into

---

[12]    The claims that were never presented to the Ohio Supreme Court (sub-claims 2, 3, 4(b) and (c), 5(f), 6, 7, 8(a), and 9 also are unexhausted.  Respondent does not argue that these claims are unexhausted.  Nevertheless, although the State's failure to raise exhaustion does not invariably waive the defense, *Granberry v. Greer*, 481 U.S. 129, 133-34 (1987), and this Court has the authority to raise the issue sua sponte, *see, e.g., Brown v. Fauver*, 819 F.2d 395, 398 (3rd Cir. 1987), the Court will not engage in a sua sponte analysis of exhaustion where the respondent has failed to raise it.  Moreover, as explained above, AEDPA's § 2254(b)(2) permits courts to deny unexhausted habeas claims on the merits where appropriate.  *See* 28 U.S.C. § 2254(b)(2); *Hanna v. Ishee,* 694 F.3d 596, 610 (6th Cir. 2012) (denying petitioner's claim on the merits "notwithstanding a failure to exhaust" the claim).

evidence.[13]  (ECF No. 44, 20-22.)

The Ohio Supreme Court fully addressed all but the "joinder" claim on direct appeal.  It

opined:

In his second proposition of law, appellant argues that his right to confront witnesses against him was violated when the court permitted, and then admitted, the deposition of Michael Smith without a showing that Crim.R. 15(F) was satisfied.

Michael Smith testified that he witnessed the Lally murder. Prior to voir dire, defense counsel raised the issue of whether the defense's motion to suppress Michael's deposition should have been granted, and a colloquy took place between the parties and the trial judge. The judge indicated that when he permitted the taking of the deposition on June 16, 1995, it was done with the understanding that Michael was going to testify at trial and that "it had to be a damn good reason why he wouldn't." The court at that time declined to disturb its denial of the defense motion to suppress.

However, during the voir-dire process, the court conducted a hearing regarding the admissibility of Michael Smith's deposition. Cleveland Police Detective Michael Beaman testified that he had been trying to locate Michael Smith in the Cleveland area for several months without success. Although Michael Smith was leasing an apartment in Cleveland that was current on rental payments, Beaman could not find him even with the assistance of the landlord, neighbors, and the county housing authority police. Beaman was also unsuccessful in locating Michael Smith through phone calls of numbers that Michael Smith had phoned during the time he was staying at the prosecution-provided motel room at the time just prior to his deposition.

Leiby testified that Michael Smith contacted him on June 5, 1995, and told him that he received what "we felt was a death threat." Leiby further stated that at the close of Michael's deposition, appellant threatened Michael by saying, "I raised the boy and now I have got to kill him." Subsequent to giving the deposition, Michael failed to report to his probation officer and a warrant was issued for his arrest.

In August 1995, Michael Smith was located and was held in the Cuyahoga County Jail for two days with the intent of transferring him to the Lorain County jail facility. However, Cuyahoga County authorities had no warrant on Michael, so the jail refused to hold him. Leiby stated that they were also concerned about Michael's safety at the Lorain County Jail, since both appellant and Jalowiec were being held there.

---

[13]     Mr. Smith includes other errors related to the Smith deposition in his discussion of his second ground for relief, such as the Elyria Police Department procuring Michael's absence from trial and the many procedural defects of the deposition, but these are not errors of the trial court and are addressed under the rubric of other claims.

Therefore, they decided at that time that Michael would be released early. Yet, four or five weeks later, Michael again failed to contact his probation officer and another warrant was issued for his arrest. Numerous attempts by Leiby to locate Michael were unsuccessful, even though Michael indicated at his deposition that he would be available to testify at trial. Leiby further stated that they took the deposition, since the prosecution was concerned for Michael's health and well-being. Among other things, Michael had attempted suicide on April 2, 1995. At the close of the hearing, the trial court ruled that the deposition would be allowed unless Michael was found.

Before closing argument at the trial phase, the prosecutor informed the court that Michael Smith had telephoned Detective Leiby from out of state two days earlier and indicated his willingness to testify. However, Michael was afraid that there were probation warrants out for his arrest. Leiby informed Assistant Prosecutor Rosenbaum of the phone call, and Rosenbaum told Leiby to tell Michael that he would pay for Michael's way to come back from wherever he was to testify. However, Rosenbaum could not make any promises regarding his probation. Michael called Leiby back that same night, and Leiby informed him of the situation. After that conversation, the state did not hear from Michael again. Subsequently, the deposition was submitted to the jury as an exhibit during its deliberations.

Crim.R. 15(F) provides: "[A] part or all of a deposition * * * may be used if it appears: * * * that the witness is out of the state, unless it appears that the absence of the witness was procured by the party offering the deposition * * *."

Here, the testimony indicated that Michael Smith was out of the state and that reasonable efforts by the state to make him available to testify at trial were unsuccessful. The state's efforts to procure Michael's live testimony appear to have been reasonable, adequate, and made in good faith. The record indicates that the state continued to seek Michael's live testimony at trial up to the time when the case was submitted to the jury. There is no evidence that the state was responsible for or procured Michael's absence from Ohio. Rather, the record shows that Michael made himself unavailable because he felt that his life was in danger. Thus, the trial court did not abuse its discretion in admitting the deposition into evidence in light of Michael's unavailability to testify under Crim.R. 15(F). See, e.g., *State v. Jenkins* (1984), 15 Ohio St.3d 164, 222, 15 OBR 311, 361, 473 N.E.2d 264, 313; *State v. Koontz* (1979), 65 Ohio App.2d 264, 269–270, 19 O.O.3d 246, 249–250, 417 N.E.2d 1272, 1276.

Moreover, appellant's right to confront his accuser was not violated by the introduction of the deposition. Contrary to defense arguments, appellant was able to confront his accuser, Michael Smith, at the deposition. Appellant's defense counsel at the time cross-examined Michael, as did counsel for both co-defendants. Therefore, we overrule appellant's second proposition.

*Smith*, 87 Ohio St. 3d at 431-32, 721 N.E.2d at 104-05.

The Sixth Amendment's Confrontation Clause protects a defendant's right "to be confronted with the witnesses against him." U.S. Const. amend. VI. This right is secured for defendants in state as well as in federal criminal proceedings. *Pointer v. Texas*, 380 U.S. 400 (1965). The Supreme Court long ago explained that the Clause's

> "primary object . . . was to prevent depositions or ex parte affidavits . . . being used against the prisoner in lieu of a personal examination and cross-examination of the witness in which the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the matter in which he gives his testimony whether he is worthy of belief."

*Barber v. Page*, 390 U.S. 719, 721 (1968) (quoting *Mattox v. United States*, 156 U.S. 237, 242-43 (1895)). The Court has emphasized that "a primary interest secured by [the Confrontation Clause] is the right of cross-examination." *Douglas v. Alabama*, 380 U.S. 415, 418 (1965). Cross-examination, it has stated, "is critical for ensuring the integrity of the fact-finding process," *Kentucky v. Stincer*, 482 U.S. 730, 739 (1987), and "the principal means by which the believability of a witness and the truth of his testimony are tested." *Davis v. Alaska*, 415 U.S. 308, 316 (1974). Indeed, the Court has recognized that cross-examination is the "'greatest legal engine ever invented for the discovery of truth.'" *California v. Green*, 399 U.S. 149, 158 (1970) (quoting 5 J. Wigmore, *Evidence* § 1367, at 29 (3d ed. 1940)).

Accordingly, there traditionally has been an exception to the confrontation requirement where a witness is unavailable and has given testimony at a deposition at which the defendant had an opportunity to cross-examine the witness. The "clearly established Federal law" on this issue for purposes of this Court's review under § 2254(d) is set forth in *Ohio v. Roberts*, 448 U.S. 56 (1980).[14]

---

[14]     In 2004, the Supreme Court decided *Crawford v. Washington*, 541 U.S. 36 (2004), which effectively overruled *Ohio v. Roberts*. The *Roberts* decision, however, was the "clearly established Federal law" on the Confrontation Clause when the Ohio Supreme Court decided Mr.

In *Roberts*, the Supreme Court held that an unavailable witness's out-of-court statements were admissible only if they bore "adequate indicia of reliability." *Id.* at 66 (internal quotation marks omitted). Where the statements did not fall within "a firmly rooted hearsay exception," they were inadmissible "absent a showing of particularized guarantees of trust worthiness." *Id.* The "relevant circumstances" for determining whether evidence satisfied this standard included only those that surrounded the making of the statement and that rendered the declarant "particularly worthy of belief." *Idaho v. Wright*, 497 U.S. 805, 819 (1990).

The Supreme Court never established exact requirements for a statement to be deemed trustworthy. *See Wright*, 497 U.S. at 822 ("We . . . decline to endorse a mechanical test for determining 'particularized guarantees of trustworthiness' under the Clause."). The Court emphasized instead that "the unifying principle" was whether the declarant "was particularly likely to be telling the truth when the statement was made." *Id.* It took a "general approach" to determining trustworthiness, affirming that "courts have considerable leeway in their consideration of appropriate factors." *Id.* at 814, 822.

Mr. Smith maintains, as a preliminary matter, that this Court should review his claim de novo, because the Ohio Supreme Court failed to address *Roberts* or any other federal constitutional law and limited its discussion only to Rule 15 of the Ohio Rules of Criminal Procedure. (ECF No. 127, 57-59.) In fact, as shown above, the Ohio Supreme Court directly addressed Mr. Smith's "right to confront" Michael Smith after discussing the state procedural rule. Moreover, the Supreme Court has held that AEDPA deference applies regardless of whether the state court provided little or no reasoning at all

Smith's case on January 5, 2000, and will be applied here. *See Greene v. Fisher*, 132 S. Ct. 38, 44 (2011) ("clearly established Federal law" under § 2254(d) is the law as it existed "at the time of the state-court adjudication on the merits").

for its decision.  *Harrington v. Richter,* 131 S. Ct. at 784.  Indeed, a state court need not cite or even be

aware of Supreme Court cases under § 2254(d).  *Id*.  The Court in *Harrington* explained,

> Where a state court's decision is unaccompanied by an explanation, the habeas
> petitioner's burden still must be met by showing there was no reasonable basis for the
> state court to deny relief.  This is so whether or not the state court reveals which of the
> elements in a multipart claim it found insufficient, for § 2254(d) applies when a
> "claim," not a component of one, has been adjudicated.

*Id*.  AEDPA deference applies to this claim.

Mr. Smith argues in the alternative that if AEDPA applies, the Ohio Supreme Court's decision

is contrary to, or an unreasonable application of, *Roberts* and its progeny under § 2254(d)(1).  He first

contends that because the Ohio Supreme Court referred in passing to a "conspiracy among [Mr.

Smith], Danny, Michael, and Jalowiec," Michael Smith was a co-conspirator, and therefore his

deposition testimony was "presumptively unreliable."  He cites as support *Richardson v. Marsh*, 481

U.S. 200, 208 (1987);  *Douglas*, 380 U.S. at 419; and *Lee v. Illinois*, 476 U.S. 530, 541 (1986), among

others.  (ECF No. 127, 54-56.)  The Court disagrees.  Michael Smith was never indicted for this

offense, and Mr. Smith points to no evidence admitted at trial of Michael's involvement in Mr. Lally's

murder beyond that of a bystander.  At his deposition, Michael specifically denied being involved in

any conspiracy to kill Mr. Lally; he testified that he had no knowledge of the planned murder and

cowered in the car while it took place.  (*See, e.g*., ECF No. 125-2, 13, 21, 32, 47-48, 81-83, 89-90.)

Mr. Smith also argues that the Ohio Supreme Court unreasonably applied *Roberts* when it

based its determination that Michael's deposition testimony was sufficiently trustworthy on the sole

fact that Michael was cross-examined by Mr. Smith's counsel as well as the other two defendants'

counsel.  He asserts that the court did not undertake the "fact-intensive review a court must conduct in

order to assess the 'particularized guarantees' of reliability" that is required by Supreme Court

61

jurisprudence on this issue.  (ECF No. 127, 61-62.)  Again, the Supreme Court held in *Harrington v. Richter* that even a summary denial of a constitutional claim can satisfy § 2254(d).  It stated,

> When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary.

*Harrington*, 131 S. Ct. at 784-85.  Mr. Smith has not overcome the presumption that the state court adjudicated his constitutional claim on the merits, and this argument is not well-taken.

Mr. Smith further contends that the Ohio court's decision regarding his right to confrontation was an unreasonable determination of the facts under § 2254(d)(2).  He points to several reasons why Michael's deposition testimony lacked the required indicia of reliability.  First, he cites the "total failure of any judicial oversight," including the court's failure to review the transcript and rule on objections to it.  (ECF No. 127, 63.)  Without a motion from counsel, however, the trial court had no obligation to review the transcript or rule upon the admissibility of any portion of it.  This argument relates more to the ineffectiveness of counsel than the reliability of the deposition testimony.

Mr. Smith also complains that the prosecutor twice vouched for Michael's credibility when he objected during the deposition and stated that the record was consistent with his testimony.  (*Id.* at 63-64.)  The prosecutor's comments did not constitute impermissible vouching.  *See infra* Part VI.C.2.a.iv.  And even if they did, the prosecutor's opinion of Michael's testimony has no bearing on the inherent trustworthiness of the testimony itself.

Mr. Smith argues next that the greatest factor contributing to the unreliability of the deposition was the fact that counsel for his co-defendants participated in it and cross-examined Michael.  (*Id.* at 64-65.)  This argument is not persuasive.  The testimony elicited from the other two defendants' counsel may have been damaging to Mr. Smith, but that does not impact the testimony's reliability.  If

62

anything, the additional cross-examination may have enhanced its trustworthiness.

Mr. Smith also maintains that the deposition was unreliable because it contained "inadmissible hearsay," and cites one example.  (*Id*. at 65.)  Again, this defect does not relate to the truthfulness and reliability of Michael's testimony as a whole.  Furthermore, counsel did not object to the one instance of hearsay to which Mr. Smith refers, and the trial court was never asked to rule upon its admissibility.

Mr. Smith next finds the deposition's reliability compromised because Michael testified at the deposition for a brief time, comprising seventeen pages of the 96-page transcript, without being sworn in.  (*Id*. at 65-66.)  At that point, the prosecutor commented, "Let the record reflect that the Court Reporter has pointed out that we neglected to swear in Mr. Smith.  By stipulation of the parties, the attorneys have agreed to swear him in now and affirm what he said has been the truth."  One of the attorneys present refused, stating, "I'm not agreeing to that," and the prosecutor then agreed to start the deposition over after swearing Michael in.  (ECF No. 125-2, 17.)  Mr. Smith complains that this episode permitted the jury to "read and consider twice" Michael's testimony.  This argument is misplaced.  The jury had the transcript during its deliberations and could read the sworn or unsworn testimony as many times as it wished.  Mr. Smith also asserts that the prosecutor's proposed stipulation created the impression that defense counsel stipulated to the truth of the testimony because defense counsel did not object to the statement.  But one of the attorneys did object to the prosecutor's characterization of the situation, and the parties began the deposition over after properly swearing in Michael.  Finally, Mr. Smith protests that a co-defendant's counsel referred to one particular unsworn statement.  That isolated incident, however, would not affect the testimony's reliability.

Mr. Smith contends that the deposition's trustworthiness was further undermined when the jury was allowed to consider the prosecutor's instructions to Michael not to answer any questions about

"his family or his personal life as a result of him being in fear," and Mr. Smith's counsel did not

object, seek to pursue the line of questioning, or seek judicial review of the matter.  (ECF No. 127, 66-

67.)  Defense counsel did, however, question Michael extensively about his drug use and mental

health.  (*See, e.g.*, ECF No. 125-2, 33-36, 40-45.)  Beyond that, this argument relates more to the

ineffectiveness of counsel than the reliability of the Smith deposition testimony.

Mr. Smith also complains that repeated comments by the prosecutor that Mr. Smith posed a

threat to Michael and the State was protecting him impacted the deposition's reliability.  (ECF No.

127, 67-68.)  As Mr. Smith concedes, however, his counsel did not object to the statements, and the

trial court therefore had no obligation to strike them.

Mr. Smith maintains that the deposition testimony was unreliable because the deposition was

not conducted in accordance with the Ohio Rules of Civil Procedure, as it included unsworn

testimony, was never submitted to Michael for review and signature, and was never filed with the trial

court.  (ECF No. 127, 68.)  These procedural flaws had negligible impact on the deposition's

reliability.

Mr. Smith argues that the deposition also was unreliable because it occurred "at a time

considerably after the event."  (*Id.*)  But this would be true even if Michael had testified at trial and

does not impact the deposition testimony's reliability.

Mr. Smith's next complaint is that Det. Leiby, who attended the deposition, testified at trial

that "to the best of my knowledge" the transcript was "a true and accurate transcript," but he also

acknowledged that he had "looked at it briefly."  (ECF No. 127, 69.)  The detective's statement

suggests nothing more than that the transcript is a true record of the testimony, not that the testimony

itself is true.  And Mr. Smith offers no other evidence that the transcript is not an accurate record of

Michael's testimony.

Mr. Smith argues that the testimony's reliability was undermined by the reference in the deposition transcript to, and Det. Leiby's testimony about, Mr. Smith's use of the word "kill" at the end of the deposition.  (*Id*.)  The deposition transcript records that, at the end of the Smith deposition, Mr. Smith said, " – kill – ."  (ECF No. 125-2, 95.)  Det. Leiby testified at trial that what Mr. Smith said was, "I raised the boy, now I got to kill him."  (ECF No. 70, 706.)  Mr. Smith's counsel cross-examined Det. Leiby on that point.  He also presented a witness, a private investigator for one of the co-defendants, who attended the deposition and testified that his impression of what Mr. Smith said was, "[H]e stated, 'That is my son, I raised him,' and then he shrugged his head and shrugged his shoulders, 'and now I am going to kill him?' And I took it as a question."  (*Id*. at 721.)  Again, the problems posed by Mr. Smith's utterance of the word "kill" and the State's use of that statement possibly relate to the ineffectiveness of counsel, and they may have been damaging to Mr. Smith.  But they do not undermine the reliability of Michael's deposition testimony.

Finally, Mr. Smith asserts that the ineffectiveness of his counsel must also be considered in determining the reliability of the deposition testimony.  He argues that the Supreme Court in *Roberts* considered the effectiveness of the defense counsel's cross-examination in deciding whether prior testimony of an unavailable witness was reliable.  (ECF No. 127, 70-71.)  The *Roberts* Court stated in a footnote,

> We need not consider whether defense counsel's questioning at the preliminary hearing surmounts some inevitably nebulous threshold of "effectiveness." In *Mancusi*, to be sure, the Court explored to some extent the adequacy of counsel's cross-examination at the earlier proceeding. *See* 408 U.S., at 214–215, 92 S.Ct., at 2313–2314. That discussion, however, must be read in light of the fact that the defendant's representation at the earlier proceeding, provided by counsel who had been appointed only four days prior thereto, already had been held to be ineffective. *See id*., at 209, 92 S.Ct., at 2311. Under those unusual circumstances, it was necessary to

65

explore the character of the actual cross-examination to ensure that an adequate opportunity for full cross-examination had been afforded to the defendant. *Cf. Pointer v. Texas*, 380 U.S., at 407, 85 S.Ct., at 1069. We hold that in all but such extraordinary cases, no inquiry into "effectiveness" is required. A holding that every case involving prior testimony requires such an inquiry would frustrate the principal objective of generally validating the prior-testimony exception in the first place—increasing certainty and consistency in the application of the Confrontation Clause.

The statement in *Mancusi* quoted in the text indicates the propriety of this approach. To the same effect is *Mattox v. United States*, 156 U.S., at 244, 15 S.Ct., at 340. ("The substance of the constitutional protection is preserved to the prisoner in the advantage he has once had of seeing the witness face to face, and of subjecting him to the ordeal of a cross-examination").

*Roberts*, 448 U.S. at 74 n.12. This is not such an extraordinary case. The Court finds Mr. Smith's counsel performed a reasonable cross-examination of Michael Smith and has otherwise denied Mr. Smith's related ineffective-assistance claims. *See supra* Part VI.A.2.a.

The Sixth Circuit recently observed in deciding a habeas Confrontation Clause claim,

"[b]ecause AEDPA authorizes federal courts to grant relief only when state courts act unreasonably, it follows that the more general the rule at issue – and thus the greater the potential for reasoned disagreement among fair-minded judges – the more leeway state courts have in reaching outcomes in case-by-case determinations." *Renico v. Lett*, 559 U.S. 766, 776 (2010) (citations and internal quotation and alteration marks omitted)). Since the Supreme Court expressly granted state courts "considerable leeway" in determining the trustworthiness of a hearsay statement, federal courts may grant relief only when state courts exercise their discretion "unreasonably."

*Miller v. Stovall*, – F.3d – , No. 12-2171, 2014 WL 519627, at * 3 (6th Cir. Feb. 11, 2014). Here, the Ohio Supreme Court's decision that the trial court did not violate Mr. Smith's right to confront his son Michael by permitting and then admitting Michael's deposition at trial was reasonable.

As an eyewitness to the murder, Michael Smith's testimony was critical to the State's case. The trial court permitted the deposition out of concern for Michael's safety, which later was corroborated by Mr. Smith's comment at the end of the deposition. At the deposition, Mr. Smith and his counsel confronted Michael face-to-face and counsel vigorously cross-examined him, as did

66

counsel for Mr. Smith's co-defendants.  At trial, the court conducted a hearing before admitting the

deposition, at which the State demonstrated its good-faith but unsuccessful efforts to secure Michael's

presence.  Thus, the trial court acted fairly and reasonably in handling the Smith deposition, balancing

Mr. Smith's critical right as a defendant in a capital case to confront the witnesses against him with the

State's important interest in preserving crucial, reliable testimony.  As the Supreme Court declared in

*Roberts*, "[E]very jurisdiction has a strong interest in effective law enforcement, and in the

development and precise formulation of the rules of evidence applicable in criminal proceedings."

*Roberts*, 448 U.S. at 64.  *See also Mattox*, 156 U.S. at 243 ("general rules of law of this kind, however

beneficent in their operation and valuable to the accused, must occasionally give way to considerations

of public policy and the necessities of the case"); *Martinez v. Court of Appeal*, 528 U.S. 152, 163

(2000) ("[T]he overriding state interest in the fair and efficient administration of justice" is significant

enough to "outweigh an invasion of the appellant's interest in self-representation."); *United States v.

Scheffer*, 523 U.S. 303, 308–09 (1998) ("A defendant's right to present relevant evidence is not

unlimited, but rather is subject to reasonable restrictions. A defendant's interest in presenting such

evidence may thus 'bow to accommodate other legitimate interests in the criminal trial process.' . . .

[The interests here] include ensuring that only reliable evidence is introduced at trial [and] preserving

the court members' role in determining credibility . . . ." (footnote and citations omitted) (quoting

*Rock v. Arkansas*, 483 U.S. 44, 55 (1987)).[15]

---

[15]     Mr. Smith also argues in his Traverse that the Ohio post-conviction court's
decision relating to Michael Smith's unavailability at trial and deposition was an unreasonable
determination of the facts under § 2254(d)(2).  (ECF No. 127, 72-80.)  He did not first raise that
argument in his Petition, however, and we need not address it.  *See Tyler v. Mitchell*, 416 F.3d
500, 504 (6th Cir. 2005) (holding that district court did not err in declining to address claim first
raised in traverse rather than in habeas petition.).  Even if the Court were to find this claim
properly presented, however, it would be unavailing.  The claim Mr. Smith raised to the post-

**b.**     **trying the case to a tainted jury**

For this sub-claim, Mr. Smith asserts that he was denied his Sixth Amendment right to a "trial, by an impartial jury . . . ." U.S. Const. amend. VI. His entire argument is as follows:

> Before and during Petitioner's trial, the media in Lorain County lavished excessive attention and publicity upon the proceedings against him and his co-defendants.
>
> The publicity was massive, pervasive and prejudicial to Petitioner; it affected the court and jurors and thereby deprived him of a fair trial and due process of law. *Sheppard v. Maxwell*, 384 U.S. 333, 86 S. Ct. 1507 (1966).

(ECF No. 44, 34.) This claim is meritless. Mr. Smith provides little authority and no evidence to support it. *See Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 554 (1976) ("pretrial publicity even pervasive, adverse publicity does not inevitably lead to an unfair trial"); *Murphy v. Florida*, 421 U.S. 794, 799 (1975) (in order to establish prejudice, trial must be "entirely lacking in the solemnity and sobriety to which a defendant is entitled"); *DeLisle v. Rivers*, 161 F.3d 370, 382 (6th Cir. 1998) (prejudice is presumed only where it is shown that the atmosphere in the community or the courtroom is sufficiently inflammatory).

**c.**     **evidentiary rulings**

Mr. Smith asserts in numerous sub-claims that the trial court violated his constitutional right to due process by allowing certain arguments by the prosecutor and admitting certain evidence introduced by the State. Specifically, he complains about the court's admission of: certain statements of Danny Smith; Mr. Smith's prior criminal record; false and misleading arguments by the prosecutor; evidence and arguments that Mr. Smith had a prior conviction for aggravated drug trafficking;

---

conviction court was based on the prosecutorial misconduct involved in Michael Smith's "unavailability" at trial, not on the Confrontation Clause. (ECF No. 122-7, 113.) The court's decision on that claim, therefore, is not relevant here.

evidence and arguments that Mr. Smith was engaged in prior offenses of aggravated drug trafficking;

and arguments that Mr. Smith probably had his son Michael killed to prevent his testimony.  (ECF No.

44, 38-51.)

 "[F]ederal habeas corpus relief does not lie for errors of state law." *Lewis v. Jeffers*, 497 U.S.

764, 780 (1990).  *See also Estelle v. McGuire*, 502 U.S. 62, 68 (1991) ("In conducting habeas review,

a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of

the United States.").  Generally, therefore, "alleged errors in evidentiary rulings by state courts are not

cognizable in federal habeas review."  *Moreland v. Bradshaw*, 699 F.3d 908, 923 (6th Cir. 2012).

Evidentiary rulings made by state courts only "rise to the level of due process violations [if] they

'offend[] some principle of justice so rooted in the traditions and conscience of our people as to be

ranked as fundamental."  *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quoting *Montana v.

Egelhoff*, 518 U.S. 37, 43 (1996)).

### i.      Danny Smith statements

The Ohio Supreme Court addressed Mr. Smith's claims regarding statements Danny Smith

made to Officer Homoki, Sandra Williams and Terry Hopkins that he contends were inadmissible.  It

reasoned:

> In his first proposition of law, appellant complains that the trial court permitted,
> over defense objections, several out-of-court statements made by co-defendant Danny
> Smith. Appellant contends that the statements were irrelevant hearsay. He further
> submits that none of the statements by Danny qualified as exceptions to the hearsay
> rules, nor were they properly admitted as statements in furtherance of a conspiracy
> under Evid.R. 801(D)(2)(e).
>
> Appellant first complains of statements made by Danny to Elyria police officer
> John Homoki, who responded to a disturbance call on September 15, 1993, at a Mr.
> Hero's restaurant. The disturbance involving Danny, Jalowiec, and Lally occurred
> approximately four months before the murder, and around one month after both
> appellant and Danny were arrested for aggravated trafficking as a result of Lally's

controlled buy of crack from them. Homoki testified that Danny pointed to Lally and declared, "[t]hat punk-ass bitch is going to get his." When Homoki asked Danny if he was threatening Lally, Danny responded that "[t]here is no reason to threaten the mother fucker."

These statements readily appear to be relevant under Evid.R. 402, since the state's theory of the case was that appellant and co-defendants Danny Smith and Jalowiec conspired to kill Lally in retaliation for his role as a police informant making a controlled drug buy from appellant and Danny. The threatening statements by Danny, if believed, tended to show that Danny was agitated and angry with Lally at a time subsequent to his arrest for drug trafficking.

Moreover, the statements were admissible as excited utterances under Evid.R. 803(2). Homoki testified that Danny was "excited" and "angry" at Lally. The incident also appears to have been a startling event, since the confrontation between Lally and Danny at the Mr. Hero's prompted Lally to call for police assistance. The incident, along with the appearance of a police officer at the scene, makes it more probable that the statements were excited utterances in response to a startling event before there was time for the nervous excitement in the declarant to lose domination over his reflective faculties. See *State v. Huertas* (1990), 51 Ohio St.3d 22, 31, 553 N.E.2d 1058, 1068; *State v. Simko* (1994), 71 Ohio St.3d 483, 490, 644 N.E.2d 345, 352.

Appellant next argues that Danny's out-of-court statements to Lally's fiancée, Sandra Williams, were hearsay. Over defense objections, Williams testified that Danny told her that Lally would feel "real bad" if anything happened to her or to any members of Lally's family. Danny also told Williams he knew where Lally's parents lived and that it would be a shame if their trailer happened to get blown up. The state contends that the statements were made by Danny in furtherance of a conspiracy under Evid.R. 801(D)(2). The state argues that these statements by co-defendant Danny Smith were relevant to show that he, appellant, and Jalowiec participated in a conspiracy to silence Lally through intimidation, and eventually murder.

In our view, these statements were not hearsay, because they were not offered to prove the truth of the matter asserted ( *i.e.*—that Lally would feel bad, that he knew where Lally's parents lived, that it would be a shame, *etc*.). However, even if we were to assume that such statements were arguably hearsay, under Evid.R. 801(D)(2) hearsay does not include "a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy upon independent proof of the conspiracy." This court recognized in *State v. Carter* (1995), 72 Ohio St.3d 545, 651 N.E.2d 965, paragraph three of the syllabus, that "[t]he statement of a co-conspirator is not admissible pursuant to Evid.R. 801(D)(2)(e) until the proponent of the statement has made a prima facie showing of the existence of the conspiracy by independent proof." See, also, *State v. Milo* (1982), 6 Ohio App.3d 19, 6 OBR 44, 451 N.E.2d 1253.

70

Prior to Sandra Williams's testimony, Sharon Hopkins testified that appellant and Michael were dropped off near the railroad tracks on the morning of the murder, and that shortly thereafter a LeBaron convertible went over to where appellant and Michael were. Sharon saw four people in the LeBaron but could identify only Jalowiec. Danny told her to ask if his brother had been picked up. Later, she learned from her brother Terry that Lally had been killed.

This independent proof of a conspiracy was insufficient to establish a prima-facie case at the time Williams testified. However, independent proof of the conspiracy among appellant, Danny, Michael, and Jalowiec was admitted into evidence before the case was submitted to the jury. Compelling independent evidence during trial established that Danny approached Terry about killing somebody a few months prior to the murder. Officer Homoki testified about Danny's threats to Lally shortly after Danny and appellant had been arrested as a result of Lally's controlled drug buy from them. On the morning of the murder, Terry saw Danny, and Danny told him "they did it." Later that day, appellant, Danny, Michael, and Jalowiec were at Danny's apartment bragging about how they shot the victim, ran over him with the car, stabbed him, and stepped on him. Jalowiec said that "they had killed the guy." Audiotapes and transcripts of appellant's statements to the police were admitted into evidence. These statements put appellant with Lally together and at the cemetery on the night and morning Lally was killed, and showed that Jalowiec was also involved. The DNA results showed that Lally's blood was found on the trunk liner of the LeBaron convertible. Michael's eyewitness deposition detailed the events both before and during the murder of Lally by appellant and Jalowiec. Hence, as in *Carter, supra*, 72 Ohio St.3d at 550, 651 N.E.2d at 972, the premature introduction of Danny's statements was harmless error.

Last, the out-of-court statements of Danny to Terry Hopkins are cited by appellant as also constituting inadmissible hearsay. Yet Danny's statement to Hopkins that he was sick appears to qualify as a statement of Danny's then-existing mental, emotional, or physical condition under Evid.R. 803(3). In addition, Danny's statement that "they did it" could be categorized as an excited utterance under Evid.R. 803(2), since Hopkins described Danny as being "nervous" and "bothered" when he talked with him shortly after the murder. *See Huertas, supra*, 51 Ohio St.3d at 31, 553 N.E.2d at 1068; *Simko, supra*, 71 Ohio St.3d at 490, 644 N.E.2d at 352. The admission of Terry Hopkin's testimony about the other out-of-court statements made by the co-conspirators bragging about the murder at Danny's apartment also appears to be harmless error as to the timing of its admissibility and in light of the abundant evidence of appellant's guilt. *Carter*, supra. Accordingly, we overrule appellant's first proposition.

*Smith*, 87 Ohio St. 3d at 433-35, 721 N.E.2d at 105-07.

Mr. Smith does not provide any argumentation to show that the Ohio Supreme Court's

decision regarding these claims was unreasonable under § 2254(d)(1) other than conclusory assertions that the statements' admission violated his constitutional rights.  These claims, therefore, fail.

Mr. Smith's remaining claims regarding evidentiary rulings primarily concern testimony and evidence related to Mr. Smith's indictment for the underlying 1993 aggravated drug trafficking, his prior convictions, Danny Smith's subsequent indictments, and his threat against his son Michael. These sub-claims were either never presented to the state courts or adjudicated on the merits by them, so this Court reviews them de novo.

### ii. underlying 1993 aggravated drug trafficking indictment

As explained above in relation to Mr. Smith's ineffective-assistance claim, evidence concerning Mr. Smith and Danny Smith's 1993 indictment for aggravated drug trafficking was relevant and probative of Mr. Smith's motive for murdering Mr. Lally and in proving the death penalty specification.  *See supra* Part VI.A.2.c.  These sub-claims lack merit.

### iii. Mr. Smith's prior convictions

Mr. Smith's sub-claims related to testimony, evidence and argument regarding his prior convictions similarly fail.  Certain of this evidence was contained in the court file for the 1993 aggravated drug trafficking indictment, which, as discussed above, was a critical piece of evidence to prove the death penalty specification.  In addition, as noted in connection with Mr. Smith's ineffective-assistance claim, Mr. Smith's counsel, as part of his trial strategy, used evidence of Mr. Smith's prior convictions to argue that while Mr. Smith may have been involved with drugs, he was not a murderer.  *See supra* Part VI.A.2.c.

### iv. Danny Smith's subsequent indictments

Mr. Smith further argues that the trial court erroneously permitted Det. Leiby to testify

72

regarding certain statements Danny Smith made to him on April 28, 1994, and January 7, 1995.  He complains that this testimony prejudiced Mr. Smith by revealing that Danny Smith was charged with additional criminal offenses after the murder occurred, then offered to make a deal with the prosecutor in exchange for information about Mr. Smith's role in the murder.  Danny Smith also provided information that corroborated the State's case against Mr. Smith – namely, that he had driven his father and brother to the area where the State contended Mr. Jalowiec later met them with Mr. Lally.  (ECF No. 44, 43-44.)  The trial court overruled defense counsel's objection to this testimony on the ground that it was admitted not to show that Danny was ultimately convicted for these offenses, but for the limited purpose of explaining why Danny contacted the police, which in turn led to Mr. Smith's statements to police and subsequent arrest.  (ECF No. 70, 695-98, 702-03.)  Mr. Smith does not explain why the trial court's admission of this testimony violated his due process rights.  As the trial court ruled, this testimony was necessary and relevant.  This sub-claim is meritless.

### v.     Mr. Smith's threats to harm Michael Smith

For this sub-claim, Mr. Smith asserts that the trial court should not have permitted the prosecutor to argue in his opening statement, "Now, as a result of the fact that this group of people had been known to kill all those that are testifying against them, the State moved this Court to take [Michael's] deposition to preserve his testimony."[16]  (ECF No. 44, 49.)  As will be explained below, the Court does not find this comment to be improper, and it therefore does not support a claim of trial court error.  *See infra* Part VI.C.2.b.ii.

### c.     insufficiency of evidence

---

[16]     Mr. Smith also complains about a similar statement the prosecutor made during the penalty phase of trial.  Because Mr. Smith no longer contests his sentence, that claim is moot.

Mr. Smith argues for this sub-claim that the trial court erred by not dismissing all charges against Mr. Smith for insufficient evidence relating to three elements of aggravated homicide:  the venue of the trial court, prior calculation and design, and Mr. Lally's cause of death.  (ECF No. 44, 38.)  This claim repeats the claim Mr. Smith originally asserted in his tenth ground for relief but has since abandoned.  The Court, therefore, assumes this claim also is abandoned.

### d.    failing to give limiting or curative jury instructions.

In this last sub-claim, Mr. Smith states that the trial court "did not give any limiting instructions with regard to this highly prejudicial testimony." (ECF No. 44, 51.)  It is unclear exactly to which testimony Mr. Smith is referring or what instructions should have been given.  Nor does Mr. Smith provide any legal authority to support this claim.  To the extent that Mr. Smith is arguing that the trial court should have given an instruction limiting Det. Leiby's testimony regarding Mr. Smith's 1993 drug trafficking charges and other prior convictions, the Ohio Supreme Court conducted a plain-error review of this claim (because Mr. Smith had waived the claim by not presented it to the court of appeals) and rejected it.  As explained with regard to Mr. Smith's related ineffective-assistance claim, the court found Det. Leiby's testimony regarding the underlying offense was necessary to prove Mr. Smith's motive in the murder – preventing Mr. Lally from testifying against him and his son.  *Smith*, 87 Ohio St. 3d at 437, 721 N.E.2d at 108.  It added,  "In addition, absent a request, the trial court was under no duty to provide a limiting instruction as to what parts of Leiby's testimony the jury should consider." *Id.*, 721 N.E.2d at 108-09.  This Court agrees.  If  Mr. Smith asserts additional bases for this claim, they are waived for lack of argumentation.  These sub-claims, too, lack merit.

### C.    *Third Ground for Relief:  Prosecutorial Misconduct*

For his third ground for relief, Mr. Smith claims that the prosecutor violated his constitutional

rights in numerous ways.  Specifically, he complains that the prosecutor:

1.      misrepresented the unavailability of Michael Smith for trial;

2.      interfered with the Smith deposition;

3.      interfered with Mr. Smith's access to Michael Smith;

4.      made improper remarks during the Smith deposition;

5.      misrepresented facts during the trial, including:

       a.      the existence of a drug enterprise,

       b.      that Mr. Smith killed his son Michael,

       c.      Mr. Smith's 1993 drug trafficking charge,

       d.      Mr. Smith's prior criminal record, and

       e.      suggesting defense counsel was misleading the jury; and

6.      discriminatory use of peremptory challenges.

(ECF No. 44, 22-34.)

### 1.      Procedural Posture

Respondent argues that the following prosecutorial-misconduct sub-claims are procedurally defaulted: sub-claims 5(b), (d), and (e), because they were presented on direct appeal to the Ohio Supreme Court but were deemed waived and therefore reviewed only for plain error; sub-claim 1, because it was raised for the first time on post-conviction but not appealed; sub-claim 6, because it was not raised to the Ohio Supreme Court on direct appeal and was not raised to the court of appeals on post-conviction; and sub-claims 2, 3, 4, and 5(c), because they were never presented to the state courts.  Respondent does not address the procedural posture of sub-claim 5(a).  (ECF No. 71, 78-79.)

### a.      the Smith deposition

Mr. Smith denies that his sub-claims 1 through 4, related to the Smith deposition, are procedurally defaulted.  He contends that he raised these claims on post-conviction as his ninth and twelfth claims,[17] and the court erroneously denied them on the merits because he failed to present any evidence dehors the record.  He explains that he had attached the affidavit of Ditanvia Geiger, in which she averred: "During a conversation between Michael Smith and I, Michael told me that Jonathan E. Rosenbaum, an Assistant County Prosecutor from Lorain County, and Detective Al Leiby, of the Elyria Police Department, sent him to the State of Arizona prior to the trial of Raymond Smith."  He argues that he appealed this ruling to the court of appeals by requesting a hearing on the merits of the claim, to which it incorrectly applied res judicata.  (ECF No. 127, 87-88.)  The Court disagrees.

Mr. Smith's ninth claim of relief in his post-conviction petition stated:

> Petitioner's Sixth Amendment rights under the United States Constitution were violated when the Sate of Ohio offered the deposition of Michael Smith for the Jury's consideration, instead of calling him as a live witness.  The State of Ohio knew of the whereabouts of Michael Smith prior to the conclusion of the petitioner's case, could have used proper police powers to bring him to Court, but were allowed by the Court to submit the deposition in lieu of live testimony (see Exhibit H).

(ECF No. 122-7, 111.)  Although there is no Exhibit H attached to the Second Amended Petition or to the Amended Petition in the Appendix filed in this case, the post-conviction court noted in its decision that Exhibit H consisted of three pages of the trial transcript.  (ECF No. 122-8, 124.)  In the only relevant portion of those pages, the prosecutor informed the trial court,

> As part of our efforts to continually locate Michael Smith, Detective Leiby asked his ex-wife to give his phone number to the person that Michael Smith sometimes talks to whose name is James at CPI, which was done on December 2nd, 1995, at 10:55.

---

[17]    The Court notes that Mr. Smith has characterized these same claims as trial court error violating his Sixth Amendment right to confrontation.  *See supra* note 15.

76

Michael Smith called Detective Leiby and indicated that he was willing to testify, didn't know the trial was going on, but he was afraid that he had probation warrants.  He is out of state in rehab and didn't want to be arrested.

After he discussed this with me, I indicated to Detective Leiby to indicate to Michael that we would pay for his way to and from wherever he was at to testify, but we could not make him any promises regarding his probation.

Michael Smith called back at 11:30 p.m. on the same date, December 2nd of '95, was given that information and we have not heard from him since, other than him stating that he is scared, so that is the state of Michael Smith.

(See ECF No. 70, 734.)  Mr. Smith's twelfth claim of relief in his post-conviction petition stated:

The Petitioner was denied his Constitutional right under due process and equal protection when members of the Elyria Police Department and/or the Lorain County Prosecutor's office played a role in the "unavailability" of the witness Michael Smith.

Ditanvi Geiger, [sic] was told by Michael Smith at Danny Smith's trial that members of the State's prosecution team sent him to the State of Arizona prior to the trial of the Petitioner Raymond Smith, a fact that the prosecution denies.  (see [sic] attached affidavit, Exhibit K).

(*Id*. at 113.)  Ms. Geiger's affidavit is the only document attached to the petition, but is unmarked.  (*Id*. at 115.)

The trial court denied Mr. Smith's ninth claim of relief because it alleged without any support that the State knew where Michael Smith was at the time of trial.  And, because the only evidence Mr. Smith submitted as support – the trial transcript – already was part of the record, it found the claim was barred by the doctrine of res judicata.  (ECF No. 122-8, 124-25.)  The trial court also denied Mr. Smith's twelfth claim of relief.  It decided that "[e]ven though the petitioner has offered some evidence outside the record, his petition fails because he has failed to attach any evidentiary documents to the petition which demonstrate that he was prejudiced in any way."  (*Id*. at 126.)  It concluded,

Therefore, in light of the record in this case, which overwhelmingly supports

77

the petitioner's guilt, the fact that petitioner has failed to attach any documentation to support his claim that he was constitutionally prejudiced by Michael Smith not appearing live at trial, he is not entitled to relief or a hearing on this matter. This is so even assuming that the State arranged Michael Smith's absence, which the record contradicts.

The twelfth claim for post conviction relief does not address the fact that Michael Smith was present at the deposition and cross-examined by the petitioner's lawyers as well as lawyers for all of the co-defendants.  Claiming something different would have occurred if he were present in court is unsupported speculation.

(*Id.* at 127.)

Mr. Smith did not appeal either of the claims expressly, but more generally appealed the dismissal of his petition without a hearing.  (ECF No. 122-10, 2.)  The court of appeals found that Mr. Smith "did not attempt to support any of his claims with evidence *dehors* the record."  (ECF No. 122-10, 130.)  It added in a footnote that "[a]lthough Smith has suggested that he submitted evidence to support some of his claims, this Court was unable to find any such evidence in the record."  (*Id.* at n.1.)  The court then held that "[b]ecause each of Smith's twelve claims for post-conviction relief was barred by the doctrine of *res judicata*, the trial court did not err in dismissing his petition without a hearing."  (*Id.* at 131.)

This Court finds that, as Respondent argues, Mr. Smith did not raise sub-claims 2, 3 and 4 in his post-conviction petition and they are procedurally defaulted.[18]  The Court also agrees with Respondent that sub-claim 1 is procedurally defaulted.  Mr. Smith's argument that the court of appeals improperly applied res judicata to his prosecutorial-misconduct claim based on Michael Smith's unavailability because it was supported by evidence dehors the record –  namely, Ms. Geiger's affidavit – is unavailing.

---

[18]    They also, therefore, are unexhausted.  *See supra* note 12.

First, the Court respects the state appellate court's representation that it could not find Mr. Smith's supporting evidence in the record.  And the Court must look to the last reasoned state court opinion to determine procedural default.  *Ylst v. Nunnemaker*, 501 U.S. 797, 805 (1991); *Combs v. Coyle*, 205 F.3d 269, 275 (6th Cir. 2000).  Moreover, even if the court had reviewed the Geiger affidavit, it still could properly have found that the affidavit was insufficient to overcome the res judicata bar.

Ohio courts routinely apply the res judicata rule to claims raised in petitions seeking post-conviction relief, since the doctrine prevents post-conviction relief on "any defense or any claimed lack of due process that was *raised or could have been raised by the defendant at trial*, which resulted in that judgment or conviction, *or on an appeal* from that judgment."  *State v. Cole*, 2 Ohio St. 3d 112, 113, 443 N.E.2d 169, 171 (1982) (emphasis original).  There is an exception to Ohio's res judicata doctrine, however, when a petitioner presents evidence dehors, or outside, the record to support a claim on post-conviction.  *See, e.g., State v. Smith*, 17 Ohio St. 3d 98, 101, 477 N.E.2d 1128, 1131-32 n.1 (Ohio 1985); *State v. Perry*, 10 Ohio St. 2d 175, 179, 226 N.E.2d 104, 107 (Ohio 1967) (if the defendant "had no means of asserting the constitutional claim there asserted until his discovery, after the judgment of conviction, of the factual basis for asserting that claim," then the claim "was not one that could have been raised . . . before the judgment of conviction, and hence could not reasonably be said to have been . . . waived").

The Ohio Supreme Court has cautioned, however, that evidence dehors the record will not overcome the res judicata bar in cases where "the allegations outside the record upon which [a petitioner] relies appear so contrived, when measured against the overwhelming evidence in the record of trial counsel's competence, as to constitute no credible evidence and, thus, to justify the trial court's

79

application of the principles of *res judicata*."  *Cole*, 2 Ohio St. 3d at 114, 443 N.E.2d at 171.

Accordingly, Ohio courts have limited this "new evidence" exception to evidence that "demonstrate[s]

that the petitioner could not have appealed the constitutional claim based upon information in the

original record."  *State v. Lawson*, 103 Ohio App. 3d 307, 315, 659 N.E.2d 362, 367 (Ohio Ct. App.

1995).  It must be "competent, relevant and material," and meet a "threshold standard of cogency;

otherwise it would be too easy to defeat the holding of *Perry* by simply attaching as exhibits evidence

which is only marginally significant and does not advance the petitioner's claim beyond mere

hypothesis and a desire for further discovery."[19]  *Id.* (internal quotation marks and citation omitted).

The Sixth Circuit repeatedly has held that the res judicata doctrine is an adequate and

independent state ground to procedurally bar claims asserted in federal habeas actions.  *See, e.g., Durr

v. Mitchell*, 487 F.3d 423, 432 (6th Cir. 2007); *Buell v. Mitchell*, 274 F.3d 337, 349 (6th Cir. 2001);

*Seymour v. Walker*, 224 F.3d 542, 555 (6th Cir. 2000).  The court also has held, however, that "an

incorrect application of a state *res judicata* rule does not constitute reliance on an adequate and

independent state ground."  *See Wogenstahl v. Mitchell*, 668 F.3d 307, 341 (6th Cir. 2012) (citing

*Durr*, 487 F.3d at 434-35, and *Richey v. Bradshaw*, 498 F.3d 344, 359 (6th Cir. 2007) (noting that the

court has "declined to observe Ohio's procedural bar and instead [has] proceeded to the merits of an

ineffective-assistance claim when we have concluded that Ohio improperly invoked its res judicata

rule")).

---

[19]     For example, Ohio courts have found the following evidence dehors the record to overcome the res judicata bar:  evidence withheld by the state; an affidavit by a witness sworn to after the trial in which the witness states that his testimony at trial was false; and a DNA finding in cases that were heard before the use of DNA evidence.  *State v. Jones*, No. 2001-A-0072, 2002 WL 31812945, at *3 n.2 (Ohio Ct. App. Dec. 13, 2002).

Mr. Smith argues "[b]ecause Petitioner *did* support this claim with evidence outside the record the application of res judicata as a procedural bar was erroneous and should not be enforced." (ECF No. 127, 89.)  He points to the Sixth Circuit case *Hill v. Mitchell*, 400 F.3d 308 (6th Cir. 2005), for the proposition that "when a habeas petitioner raises a claim in state post-conviction court based on evidence outside the record, that claim is not procedurally defaulted even if the state post-conviction court finds to the contrary . . . ."  (*Id.*)  Indeed, the court held in *Hill* that claims raised in post-conviction "are not barred by res judicata under Ohio law when evidence outside the direct-appeal record is presented . . . ."  *Hill*, 400 F.3d at 314.  Since *Hill*, the Sixth Circuit has held in several cases that a habeas petitioner's claim was not procedurally defaulted because Ohio's res judicata bar was misapplied to the claim.  *See, e.g., Morales v. Mitchell*, 507 F.3d 916, 937 (6th Cir. 2007) (finding petitioner's ineffective-assistance claim "relies on evidence outside of the trial record and therefore was not defaulted when he failed to raise it on direct appeal"); *Richey*, 498 F.3d at 359-60; *White v. Mitchell*, 431 F.3d 517, 526-27 (6th Cir. 2005); *Greer v. Mitchell*, 264 F.3d 663, 675 (6th Cir. 2001) (all holding same).

Mr. Smith, however, oversimplifies and misrepresents *Hill*'s holding.  In the cases in which the Sixth Circuit has followed *Hill*, the court has made it clear that *Hill* does not circumvent Ohio's res judicata doctrine by permitting habeas courts to reach the merits of any claim dismissed on res judicata grounds just because a petitioner presents some supporting evidence outside the record.  Rather, the court disregarded the procedural bar only where the evidence at issue was competent, relevant and material, as the doctrine requires.  For example, the evidence at issue in *Hill* was an affidavit from an addiction specialist, who testified during the petitioner's mitigation phase that he had been contacted after the guilt phase of the trial, did not meet the petitioner until the morning he

81

testified, and that, had he evaluated the petitioner earlier, he could have testified specifically about the petitioner and his addiction as opposed to addiction in general. *Hill,* 400 F.3d at 314. In *Greer*, the evidence at issue concerned witnesses who never appeared at trial, as well as the testimony of trial counsel respecting trial strategy, which the court stated was "by definition *dehors* the record." *Greer*, 264 F.3d at 675. In *Richey*, the court observed,

> [T]he only way that Richey could make out a violation of his constitutional rights was to adduce evidence establishing what his counsel would have learned about the State's arson evidence, had his counsel performed effectively. This necessarily required evidence outside the record, and it is exactly the kind of evidence that Richey submitted with his state post-conviction petition, and further developed through discovery in the district court. . . . None of this testimony was available to Richey on direct appeal precisely because, under Ohio law, direct appeals are confined to the trial record. Had Richey asserted his ineffective-assistance-of-counsel claim on direct appeal, then, he would have lost. Without evidence showing what kind of scientific defense a reasonably competent attorney would have mounted, the state court would have had no basis for concluding that Richey's counsel was deficient and that Richey was prejudiced thereby.

*Richey*, 498 F.3d at 360. *See also White*, 431 F.3d at 527 (noting the similarity of claims and "quality of evidence presented" in that case and in *Hill*, where petitioner submitted affidavits of mitigation experts and two additional experts). *Hill*, therefore, did not create an exception allowing habeas petitioners to bypass Ohio's res judicata doctrine; it merely made explicit that habeas courts will not automatically enforce this procedural bar, but will review the ruling to ensure that it complies with Ohio law.

For the reasons explained more fully below, the Court finds that Ms. Geiger's affidavit would not have materially changed the case that could have been presented on direct appeal. The Ohio court, therefore, properly applied res judicata to this claim, and it is procedurally defaulted.

### b. misrepresentations at trial

Mr. Smith also denies Respondent's argument that his sub-claim 5, related to the prosecutor's

misrepresentations at trial, is procedurally defaulted as never presented to state courts. He contends he raised the claims in his *Murnahan* application. (ECF No. 127, 95-98, 107.) For the reasons stated above, however, *see supra* Part VI.A.1.c, this arguments fails and these claims are procedurally defaulted.[20]

### c.      discriminatory use of peremptory challenges

Mr. Smith does not address the procedural posture of this sub-claim. The Court agrees with Respondent that it is procedurally defaulted. Although Mr. Smith raised this claim on direct appeal to the court of appeals, he did not raise it to the Ohio Supreme Court. (*See* ECF No. 122-5, 936-1115.) Mr. Smith reasserted it as the eleventh claim of relief in his post-conviction Second Amended Petition, which the trial court denied on the ground of res judicata. (ECF No. 122-8, 9-10.) The court of appeals affirmed. (ECF No. 122-10, 131 ("Because each of Smith's twelve claims for post-conviction relief was barred by the doctrine of *res judicata*, the trial court did not err in dismissing his petition without a hearing.").) This sub-claim, too, is procedurally defaulted.[21]

### d.      conclusion

The Court, therefore, finds each of Mr. Smith's sub-claims to his claim of prosecutorial misconduct procedurally defaulted.[22]

### 2.      Merits

Even if all of Mr. Smith's prosecutorial-misconduct claims were preserved for review, they

---

[20]      Again, these claims also are unexhausted. *See supra* note 12.

[21]      This claim, too, is unexhausted. *See supra* note 12.

[22]      Mr. Smith does not argue that any procedural default of these claims can be excused by a demonstration of cause and prejudice, so the Court will not address that issue either.

lack merit.  As the Supreme Court has observed, "Although the State is obliged to 'prosecute with earnestness and vigor,' it 'is as much [its] duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.'"  *Cone v. Bell*, 556 U.S. 449, 469 (2009) (quoting *Berger v. United States*, 295 U.S. 78, 88 (1935)).  To assert a successful claim for prosecutorial misconduct in a habeas proceeding, however, a prosecutor's conduct must be "so egregious as to render the petitioner's trial fundamentally unfair."  *Buell v. Mitchell*, 274 F.3d 337, 364 (6th Cir. 2001).  It "is not enough that the prosecutors' remarks were undesirable or even universally condemned.  The relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 642 (1974)); *Durr v. Mitchell*, 487 F.3d 423, 439 (6th Cir. 2007).  Thus, the analysis must focus on "'the fairness of the trial, not the culpability of the prosecutor.'"  *Byrd*, 209 F.3d at 529 (quoting *Serra v. Michigan Dep't of Corrections*, 4 F.3d 1348, 1355 (6th Cir. 1993)).

The Sixth Circuit has stressed the narrow scope of a habeas court's review of this due process claim, stating, "We do not possess supervisory powers over state court trials."  *Byrd v. Collins*, 209 F.3d 486, 529 (6th Cir. 2000).  "[I]t is the responsibility of the [state courts] to police their prosecutors; we have no such authority."  *Cook v. Bordenkircher*, 602 F.2d 117, 119 n.5 (6th Cir. 1979).  It recently set forth the standards to apply to habeas claims of prosecutorial misconduct, explaining that courts must apply a "two-part test to determine whether the state court reasonably applied the federal standard in holding that prosecutorial misconduct did not render [the petitioner's] trial fundamentally unfair."  *Wogenstahl v. Mitchell*, 668 F.3d 307, 238 (6th Cir. 2012) (quoting *Irick v. Bell*, 565 F.3d 315, 324 (6th Cir. 2009)).  First, the court must determine whether the prosecution's

84

conduct was improper.  Second, it must determine whether that improper conduct was flagrant by considering four factors: (1) whether the evidence against the defendant was strong; (2) whether the conduct of the prosecution tended to mislead the jury or prejudice the defendant; (3) whether the conduct or remarks were isolated or extensive; and (4) whether the remarks were made deliberately or accidentally.  *Id.*

Claims of prosecutorial misconduct "must be answered in light of the totality of the circumstances in the case."  *Lundy v. Campbell*, 888 F.2d 467, 473 (6th Cir. 1989), *cert. denied*, 495 U.S. 950 (1990).  To constitute a denial of due process, the misconduct must be "so pronounced and persistent that it permeates the entire atmosphere of the trial."  *Id.*

### a.        the Smith deposition

Mr. Smith asserts several complaints concerning the prosecution's conduct surrounding the Smith deposition.  He claims that the State misrepresented the unavailability of Michael Smith for trial; interfered with the Smith deposition; interfered with Mr. Smith's access to Michael Smith; and improperly testified at the deposition.  (ECF No. 44, 24-25.)  Because the state courts did not adjudicate these claims on the merits, this Court reviews the claims de novo.

### i.        unavailability of Michael Smith

Mr. Smith argues that prosecutors misrepresented the basis for taking Michael Smith's deposition and then later lied to the trial court that he was unavailable to testify at trial in order to use the deposition testimony in place of his live testimony.  As noted above, Mr. Smith supports this claim with the affidavit of Ditanvia Geiger, in which she averred: "During a conversation between Michael Smith and I, Michael told me that Jonathan E. Rosenbaum, an Assistant County Prosecutor from Lorain County, and Detective Al Leiby, of the Elyria Police Department, sent him to the State of

Arizona prior to the trial of Raymond Smith." (ECF No. 110-2, 1.) He maintains that the failure to present Michael Smith in person at trial prejudiced him because his testimony was so damaging. (ECF No. 44, 25.)

Respondent argues that the Ohio Supreme Court's factual findings on this issue contradict Mr. Smith's claim and are binding on this court. (No. 71, 81-82.) As already noted in connection with Mr. Smith's Confrontation Clause argument, the Ohio Supreme Court addressed in detail the circumstances surrounding the Smith deposition. It concluded:

> Here, the testimony indicated that Michael Smith was out of the state and that reasonable efforts by the state to make him available to testify at trial were unsuccessful. The state's efforts to procure Michael's live testimony appear to have been reasonable, adequate, and made in good faith. The record indicates that the state continued to seek Michael's live testimony at trial up to the time when the case was submitted to the jury. There is no evidence that the state was responsible for or procured Michael's absence from Ohio. Rather, the record shows that Michael made himself unavailable because he felt that his life was in danger.

*Smith*, 87 Ohio St. 3d at 431-32, 721 N.E.2d at 104. *See also* Part VI.B.2.a. Mr. Smith counters that it is the trial court's recognition of Ms. Geiger's affidavit on post-conviction as "some evidence outside the record" that is entitled to AEDPA's presumption of correctness. (ECF No. 127, 94.)

The Court agrees with Respondent. Under AEDPA, state-court factual determinations are presumed to be correct and only can be overcome by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Even if the Court accepts that Ms. Geiger's affidavit is *some* evidence outside the record, that does not make the affidavit clear and convincing evidence that the Ohio Supreme Court was wrong in its assessment of the State's representations regarding Michael Smith's availability for trial. It is not. The Ohio Supreme Court carefully examined the issues surrounding the Smith deposition and was satisfied that the State had acted in good faith; the affidavit simply is not strong enough evidence to rebut that finding. This sub-claim fails.

### ii.      interference with deposition

Mr. Smith makes the conclusory assertion that the prosecutor improperly and "repeatedly interrupted cross-examination" during the Smith deposition, referencing three instances as examples. (ECF No. 44, 26.)  He provides no analysis, however, and after reviewing the cited examples the Court finds nothing improper in the prosecutor's conduct.

### iii.      interference with Mr. Smith's access to his son

For this sub-claim, Mr. Smith argues that the prosecutor improperly prevented his counsel from speaking to Michael Smith.  He points to the following exchange between Mr. Smith's counsel, Thomas Elwell, Jr., and Michael Smith that occurred at the end of the Smith deposition:

Q      If our investigator wanted to aks you questions subsequent to today's date, after today's date, before trial, would you be available to answer questions?

       Mr. Rosenbaum:      He's not gong to comment on that and we're not going to tell you where he is, and I'm going to certify that in Court.  He's in danger that he feels –

Q      Do you feel you're in danger?

A      I did receive a threat.

Q      That's not the question.

A      Two weeks –

Q      Do you feel you're in danger?

A      Yeah.  I feel I am, yeah, for me and my family.

Q      Well, they're incarcerated, correct?

A      So they're incarcerated.

Q      Excuse me?

A      They're incarcerated, and –

Q       They're no real threat to you now, are they, yes or no?

A       It's a possibility.

> Raymond Smith:        – kill –
>
> Mr. Elwell:     I have no further questions.
>
> Mr. Rosenbaum:        I thank you very much.

(ECF No. 127, 99-100; ECF No. 125-2, 148-49.)  Mr. Smith claims that "[t]he Prosecutor's alleged concern for Michael's safety was spurious."  (ECF No. 44, 26.)

Respondent notes that the prosecutor suggested that counsel request a hearing if they wanted Michael to answer questions about his family or personal life, but they did not.  (ECF No. 71, 82.) The prosecutor stated, "I've explained to [Michael] that he does not have to answer any questions regarding his family or his personal life as a result of him being in fear, so I will object to those questions and tell him not to answer.  If you need to have a hearing, I guess we'll have to consult with Judge Glavas."  (ECF No. 125-2, 127.)

The Court does not find anything improper in the prosecutor's stance regarding discovery of personal information about Michael Smith.  Mr. Smith has not provided any evidence to show that the prosecutor's concern for Michael's safety was unfounded, or that he could not have requested further discovery from the court if he had wished.  This sub-claim, therefore, lacks merit.

### iv.       improper comments during the deposition

For this sub-claim, Mr. Smith argues          that the prosecutor improperly stated during the Smith deposition that Michael Smith was "in fear" and "in danger."  He also complains that the prosecutor vouched for Michael during his deposition by twice commenting that Michael's deposition testimony was consistent with his prior statement to police.  He claims "[t]his misconduct injected

88

inadmissible, prejudicial evidence against Petitioner and deprived him of a fair trial . . . ."  (ECF No. 44, 27.)

Regarding the comments about Michael Smith's fear of testifying, the Court already has found the prosecutor's objections to questions about Michael's family and personal life on the ground that his life had been threatened to be permissible.

The Court similarly finds that the prosecutor did not improperly vouch for Michael Smith during the deposition by stating that his testimony was consistent with a previous statement to police. In *Wogenstahl v. Mitchell*, the Sixth Circuit explained that "[i]mproper vouching occurs when a prosecutor supports the credibility of a witness by indicating a personal belief in the witness's credibility thereby placing the prestige of the [government] behind the witness."  *Wogenstahl,* 668 F.3d at 328 (quoting *Johnson v. Bell*, 525 F.3d 466, 482 (6th Cir. 2008)).  It continued, "Generally, improper vouching involves either blunt comments that imply that the prosecutor has special knowledge of facts not in front of the jury or of the credibility and truthfulness of witnesses and their testimony."  *Id.* (quoting *United States v. Francis*, 170 F.3d 546, 550 (6th Cir. 1999)).  Thus, "[i]t is patently improper for a prosecutor either to comment on the credibility of a witness or to express a personal belief that a particular witness is lying."  *Id.* (quoting *Hodge v. Hurley*, 426 F.3d 368, 378 (6th Cir. 2005)).  Nevertheless, "[a] state's attorney is free to argue that the jury should arrive at a particular conclusion based upon the record evidence."  *Id.* at 329 (quoting *Caldwell v. Russell*, 181 F.3d 731, 737 (6th Cir. 1999), *abrogated on other grounds as recognized by Mackey v. Dutton*, 217 F.3d 399, 406 (6th Cir. 2000)).  The court held in *Wogenstahl* that the prosecutor's comments regarding the veracity of state witnesses and an FBI agent "verge[d] on improper vouching," but that they were harmless given that the evidence against the petitioner was strong, and the comments were

89

isolated and unlikely to mislead the jury or prejudice the petitioner.  *Id.* at 329.

Similarly, the Court finds here that the two statements of which Mr. Smith complains relating to Michael Smith's consistency with his statement to police is not stating "a personal belief in the witness's credibility," but is stating a verifiable fact.  In both instances, counsel for Mr. Smith's co-defendant were able to contest the prosecutor's statements and question Michael accordingly to clarify his testimony.  Moreover, as in *Wogenstahl*, the complained-of comments were isolated and unlikely to mislead the jury or prejudice Mr. Smith.  (ECF No. 125-2, 31-32, 46.)

### b.     misrepresentations at trial

Mr. Smith also complains that the prosecutor violated his constitutional rights by misrepresenting certain facts to the jury.  (ECF No. 44, 27-32.)

### i.     the existence of a drug enterprise

Mr. Smith objects to the following comment by the prosecutor:  "So, as a business decision it [the murder] had to be done.  They wanted to continue to be drug pushers."  (*Id.* at 28.)  The prosecutor said this during his closing argument.  (ECF No. 70, 747.)

As the Sixth Circuit explained in *Wogenstahl*, "The prosecution necessarily has 'wide latitude' during closing argument to respond to the defense's strategies, evidence and arguments."  *Wogenstahl*, 668 F.3d at 329 (quoting *Bedford v. Collins*, 567 F.3d 225, 233 (6th Cir. 2009)).  The propriety of the prosecution's closing argument depends on the circumstances of the case and "what the defense has said or done (or likely will say or do)."  *Id.*

The prosecution's reference to Mr. Smith and his son's drug trafficking during his closing argument was supported by evidence that had been presented in court and demonstrated no special knowledge of the prosecution.  Moreover, the remarks were not so flagrant that they rendered Mr.

Smith's trial fundamentally unfair.  The comment was isolated and unlikely to mislead the jury or prejudice Mr. Smith.

### ii.        that Mr. Smith killed his son Michael

Mr. Smith also claims that the prosecutor "suggested" to the jury that Mr. Smith killed his son Michael during his opening statement.  (ECF No. 44, 28-29.)  The prosecutor stated, "Now, as a result of the fact that this group of people had been known to kill all those that are testifying against them, the State moved this Court to take [Michael's] deposition to preserve his testimony."[23]  (ECF No. 70, 446.)

The Court does not agree that the prosecutor implied that Mr. Smith had murdered Michael.  After the statement at issue, he continued,

> Now, Michael Smith's whereabouts are unknown.  We are still hoping to find him.  If we can find him before the trial is over, you will hear the live testimony.
>
> If not, you will have the deposition where Michael Smith previous testified and the lawyers, for not only this Defendant, but the other two, who we feel are equally responsible and culpable for this killing of him – and you will have that for your consideration.

(*Id*.)  The prosecutor fairly and truthfully explained the circumstances surrounding the Smith deposition.  This sub-claim is meritless.

### iii.       Mr. Smith's 1993 drug trafficking charge

Mr. Smith in this sub-claim argues that the prosecutor improperly introduced Mr. Smith's case file for the 1993 drug trafficking charges and stated in closing argument, "If you look at Mr. Smith's court file, that was dismissed because the witness was killed, you will see the indictment that he has

---

[23]        Mr. Smith also complains of a similar statement the prosecutor made during his closing argument in the penalty phase, but since Mr. Smith no longer contests his sentence, that statement is not relevant here.

prior convictions, he is not a good candidate for probation."  (ECF No. 44, 29-30.)  As explained

above, this information was relevant and admissible.  *See supra* Parts VI.A.2.c. and VI.B.2.c.ii.  This

claim lacks merit.

### iv.      Mr. Smith's prior criminal record

Mr. Smith also complains that the prosecutor impermissibly disclosed Mr. Smith's prior

criminal record.  (ECF No. 44, 30-31.)  This claim similarly fails because this evidence was relevant

and admissible, even to the defense.  *See supra* Parts VI.A.2.c. and VI.B.2.c.iii.

### v.      suggesting defense counsel was misleading the jury

Finally, Mr. Smith argues that during his closing argument, the prosecutor improperly

suggested that defense counsel was misleading the jury.  (ECF No. 44, 32.)  He complains about the

following remarks:

> You may know now why Mr. Bruner says what he says is not evidence. It is up
> to the twelve of you to determine through your memories and your notes what is the
> evidence in this case.
>
> I did not hear anyone say from the stand that Stanley said he pulled the trigger.
> I heard Terry say that the three of them bragged about it, but what he is telling you is
> not testified to from the stand.
>
> Likewise, I did not hear any evidence that anyone could get beeper numbers
> after to verify a page.  Do you think if that were true and what he tells you is true that
> he would not have obtained a beeper number to show that that was not a page from
> Mom's?
>
> He is doing what I cautioned you about.  He is trying to direct your attention to
> somewhere else to what the evidence might be, what it could be, what he says it is,
> when it is not what happened from the stand.

(ECF No. 70, 789-90.)  As noted above, "The prosecution necessarily has 'wide latitude' during

closing argument to respond to the defense's strategies, evidence and arguments."  *Wogenstahl*, 668

F.3d at 329 (quoting *Bedford v. Collins*, 567 F.3d 225, 233 (6th Cir. 2009)).  The propriety of the

92

prosecution's closing argument depends on the circumstances of the case and "what the defense has said or done (or likely will say or do)."  *Id*.  The Court finds nothing improper in these remarks.

### c.  discriminatory use of peremptory challenges

Mr. Smith's sub-claim regarding the prosecutor's discriminatory use of peremptory challenges is the subject of his eighth ground for relief, which he has abandoned.  *See infra* Part VI.E.

### d.  cumulative effect

Mr. Smith asserts that the errors addressed above, when viewed cumulatively, rendered his trial fundamentally unfair.  (ECF No. 44, 33-34.)  Indeed, "[e]rrors that might not be so prejudicial as to amount to a deprivation for due process when considered alone, may cumulatively produce a trial setting that is fundamentally unfair."  *Walker v. Engle*, 703 F.2d 959, 963 (6th Cir. 1983).

Even when considering these sub-claims together, however, this Court concludes that Mr. Smith's claims of  prosecutorial misconduct do not entitle him to habeas relief.  The Court finds no instances of improper conduct, and even if the conduct that verged on improper were viewed cumulatively, Mr. Smith has failed to demonstrate flagrancy, or that it was "so pronounced and persistent that it permeate[d] the entire atmosphere of the trial."  *Wogenstahl*, 668 F.3d at 335.  As the Supreme Court has noted, "[a litigant] is entitled to a fair trial but not a perfect one, for there are no perfect trials."  *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 553 (1984) (internal quotation marks and citations omitted).

### D.  *Sixth Ground for Relief:  Suppression of Exculpatory Evidence*

For his sixth ground for relief, Mr. Smith claims that prosecutors violated his constitutional rights when they failed to disclose numerous pieces of exculpatory evidence prior to trial, as required under *Brady v. Maryland*, 373 U.S. 83 (1963).  Specifically, he alleges that the State failed to disclose

the following information:

1. the Arizona phone number(s) Michael Smith called when he was in the State's custody at or about the time of the deposition and the fact that Michael Smith was in Arizona at the time of the trial;

2. Det. Leiby procured deals and other inducements for prosecution witnesses Carl Hartman and Corinne Fike; and

3 Det. Leiby directly influenced Judge McGough to ensure that co-defendant Danny Smith received the maximum possible sentence in a different case.

(ECF No. 44, 62-66.)[24]

### 1. *Brady v. Maryland* **and its progeny**

The Supreme Court held in *Brady v. Maryland* that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. The Court has explained that this protection "will serve to justify trust in the prosecutor as 'the representative . . . of a sovereignty . . . whose interest . . . in a criminal prosecution is not that it shall win a case, but that justice shall be done.'" *Kyles v. Whitley*, 514 U.S. 419, 440 (1995) (quoting *Berger v. United States*, 295 U.S. 78, 88 (1935)). As Justice Marshall wrote, "The message of *Brady* and its progeny is that a trial is not a mere 'sporting event'; it is a quest for truth in which the prosecutor, by virtue of his office, must seek truth even as he seeks victory." *Monroe v. Blackburn*, 476 U.S. 1145, 1148 (1986) (Marshall, J., dissenting).

---

[24] Mr. Smith also contends in this claim that the prosecution put on evidence that it knew or should have known was false or failed to correct false testimony, but provides no argumentation whatsoever for that assertion. That sub-claim, therefore, is waived. In addition, he asserts in this claim that the prosecution procured Michael's absence from the trial, argued throughout the trial that it did not know where Michael was, and suggested to the jury that Mr. Smith may have killed him. These sub-claims fall more appropriately and are addressed under Mr. Smith's prosecutorial-misconduct claim, *see supra* Part VI.C.2.a.i and b.ii.

In order to establish a *Brady* violation, a petitioner must satisfy the following three requirements: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).

The Supreme Court has held that *Brady* applies regardless of whether the defendant has expressly requested such evidence. *Strickler*, 527 U.S. at 280. In addition, courts have stressed that the inquiry must be objective, independent of the intent of the prosecutors. *Brady*, 373 U.S. at 87; *Carter v. Bell*, 218 F.3d 581, 601 (6th Cir. 2000). Finally, a showing of prejudice need not mean that the evidence would have led to an acquittal, but merely "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles*, 514 U.S. at 433-34.

### 2. Procedural Posture

Respondent contends that this entire claim is procedurally defaulted, because Mr. Smith raised it in his second post-conviction petition and it was denied on procedural grounds. (ECF No. 71, 86.)

This Court cannot find, and Mr. Smith does not identify, any claim he raised in state court related to sub-claim 1, regarding the prosecutor withholding the Arizona phone number(s) that Michael Smith called when he was in the State's custody at or about the time of the deposition and the fact that Michael Smith was in Arizona at the time of the trial. That sub-claim, therefore, is procedurally defaulted and unexhausted.[25]

Mr. Smith did, however, raise sub-claims 2 and 3 in his second post-conviction petition, and

---

[25]     *See supra* note 12.

the claims were denied as untimely.  *See supra* Part II.A.3.b.  Mr. Smith first argues that this

procedural bar should be excused because it does not promote a legitimate state interest, as required.

He cites *Henry v. Mississippi*, 379 U.S. 443 (1965), in which the Supreme Court stated,

> a litigant's procedural defaults in state proceedings do not prevent vindication of his
> federal rights unless the State's insistence on compliance with its procedural rule serves
> a legitimate state interest.  In every case we must inquire whether the enforcement of a
> procedural forfeiture serves such a state interest.  If it does not, the state procedural rule
> ought not be permitted to bar vindication of important federal rights.

*Id*. at 447-48.  Mr. Smith appears to contend that there is never a legitimate state interest in enforcing a

procedural bar against a *Brady* claim because to do so would reward the state for engaging in

deceptive practices.  He relies for support of this proposition on *Rickman v. Dutton*, 864 F. Supp. 686,

706 (M.D. Tenn. 1994), in which a district court held that there could be no legitimate procedural

default of a false-testimony claim.  (ECF No. 127, 120-21.)

This argument, however, is not well-taken.  First, *Rickman* does not apply here.  Mr. Smith has

not demonstrated that a government witness testified falsely at his trial.  Moreover, the Sixth Circuit

affirmed *Rickman* on other grounds, and Mr. Smith does not cite any cases that have followed

*Rickman*.  Indeed, the Supreme Court found *Brady* claims to be procedurally defaulted in the seminal

case *Strickler*, 527 U.S. at 296 (petitioner could not show either materiality under *Brady* or prejudice

that would excuse petitioner's procedural default), and the Sixth Circuit routinely has held that *Brady*

claims were procedurally barred.  *See, e.g.*,  *Jalowiec v. Bradshaw*, 657 F.3d 293, 313-14 (6th Cir.

2011); *Henness v. Bagley*, 644 F.3d 308, 324-25 (6th Cir. 2011).  The Supreme Court noted in *Henry,*

after affirming the principle quoted above, that its ruling "will not lead inevitably to a plethora of

attacks on the application of state procedural rules," when in most cases "the state rule is a reasonable

one and clearly announced to defendant and counsel . . . ."  *Henry*, 379 U.S. at 448 n.3.  The

procedural default at issue here stemmed from Mr. Smith's untimely assertion of his *Brady* claims on appeal in state court.  Rules governing the timeliness of appeals, of course, are fundamental to state appellate procedure, and federal courts long have recognized that the failure to comply with those rules is a reasonable and valid basis on which to bar habeas review.  *See, e.g., O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999); *Van Hook v. Bobby*, 661 F.3d 264, 270-71 (6th Cir. 2011); *Coleman v. Mitchell*, 244 F.3d 533, 539-41 (6th Cir. 2001).

Mr. Smith next argues that the State's misconduct provides cause and prejudice for any procedural default.  (ECF No. 127, 122-27.)  As the Supreme Court has noted, the cause and prejudice necessary to excuse procedural default can "parallel two of the three components of the alleged *Brady* violation itself," suppression and favorability.  *Strickler*, 527 U.S. at 282.  Because the Court determines that Mr. Smith cannot satisfy these first two prongs of the *Brady* test, as will be explained more fully below, it follows that he cannot demonstrate cause and prejudice for procedural default purposes.

### 3.    Suppression and Favorability Analysis

To meet *Brady*'s suppression requirement, the petitioner must show that the evidence was in the prosecution's exclusive control.  *Coe v. Bell*, 161 F.3d 320, 344 (6th Cir. 1998).  A defendant should not be required to "scavenge for hints of undisclosed *Brady* material when the prosecution represents that all such material has been disclosed."  *Banks v. Dretke*, 540 U.S. 668, 695 (2004).  Nevertheless, it is the defendant's duty to be vigilant in seeking exculpatory material.  There is no *Brady* violation "where a defendant knew or should have known the essential facts permitting him to take advantage of any exculpatory information, or where the evidence is available . . . from another source because in such cases there is really nothing for the government to disclose."  *Coe,* 161 F.3d at

344 (internal quotation marks and citations omitted).

Evidence is considered to have exculpatory or impeachment value if it "would have resulted in a markedly weaker case for the prosecution and a markedly stronger one for the defense." *Kyles*, 514 U.S. at 441.

Applying the above Supreme Court precedent, the Court will now address each of Mr. Smith's individual *Brady* claims, analyzing the exculpatory and suppression prongs of *Brady*.  If those requirements are met, the Court will address the materiality prong of *Brady*, cumulatively.  *See id.* at 436 n.10 ("We evaluate the tendency and force of the undisclosed evidence item by item; there is no other way.  We evaluate its cumulative effect for purposes of materiality separately . . . .").  Because the state courts never adjudicated these claims on the merits, this Court reviews the claims de novo. *See, e.g., Morales v. Mitchell*, 507 F.3d 916, 930 (6th Cir. 2007).

### a.     Michael Smith's location in Arizona

Mr. Smith claims that the prosecutors knew Michael Smith had called Arizona telephone numbers while he was in protective custody around the time of his deposition, and they knew he was in Arizona at the time of Mr. Smith's trial.  He supports these contentions with Ms. Geiger's affidavit, in which she averred: "During a conversation between Michael Smith and I, Michael told me that Jonathan E. Rosenbaum, an Assistant County Prosecutor from Lorain County, and Detective Al Leiby, of the Elyria Police Department, sent him to the State of Arizona prior to the trial of Raymond Smith."[26]  (ECF No. 110-2, 1.)

---

[26]      Mr. Smith also points to an affidavit of Michael Smith to support this *Brady* claim, but the Court cannot consider it because it is not part of the record in this case. The Court has not located, and Mr. Smith has not identified, Michael Smith's affidavit in the state-court record.  And habeas corpus petitioners are significantly limited in their ability to introduce evidence outside the state-court record to support their claims. *See Cullen v. Pinholster*, 131 S.

98

As to the Arizona telephone numbers that Michael Smith called while he was in protective custody around the time of his deposition, Mr. Smith's counsel knew that information at trial.  At the hearing the trial court conducted regarding the admissibility of Michael Smith's deposition, Det. Beaman gave Mr. Smith's attorney a log of the telephone calls Michael made while in protective custody.  (ECF No. 70, 333-34.)  Attorney Bruner specifically asked Det. Beaman about an Arizona phone number.  (*Id*. at 335.)  This information was not suppressed.

As to Michael's presence in Arizona during the trial, Ms. Geiger's affidavit does not establish suppression or favorability.  As explained above, the Ohio Supreme Court carefully examined the issues surrounding the Smith deposition and was satisfied that "the state's efforts to procure Michael's live testimony appear to have been reasonable, adequate, and made in good faith."  *Smith*, 87 Ohio St. 3d at 431, 721 N.E.2d at 104.  This Court does not find Ms. Geiger's affidavit clear and convincing evidence that the Ohio Supreme Court was wrong in that assessment.  *See supra* Parts VI.B.2.a and VI.C.2.a.i.

> ### b.    prosecution deals for witnesses

---

Ct. 1388, 1401 (2011).  Habeas corpus review is limited to the state-court record unless permitted by AEDPA's § 2254(e)(2).  *Id*. at 1400-01.  Under that provision, when a petitioner seeks to introduce new affidavits and other documents never presented in state court, for the purpose of bolstering the merits of a claim, he must show *either* diligence in developing the factual basis in state court, *or* a new rule of constitutional law or factual predicate that could not have been previously discovered through the exercise of diligence, and facts showing actual innocence by clear and convincing evidence.  28 U.S.C. § 2254(e)(2).  The Supreme Court and the Sixth Circuit have held that § 2254(e)(2) applies to motions to expand the record under Habeas Rule 7(a) as well as evidentiary hearings conducted pursuant to Habeas Rule 8.  *See Holland v. Jackson*, 542 U.S. 649, 652-53 (2004); *Landrum v. Mitchell*, 625 F.3d 905, 923-24 (6th Cir. 2010).  Mr. Smith has not admitted this affidavit in an evidentiary hearing pursuant to Habeas Rule 8, nor has he moved to expand the record in this case to include Michael Smith's affidavit under Habeas Rule 7(a).  He therefore has not met the requirements of § 2254(e)(2), and this Court may not consider Michael Smith's affidavit in ruling on his *Brady* claims.

99

Mr. Smith also claims that the prosecution wrongfully withheld information that Det. Leiby directly influenced the setting of a recognizance bond to keep Carl Hartman out of jail for a probation violation, and that he caused State witness Corinne (JoAnn) Fike's car to be impounded for approximately one year in order to obtain favorable testimony.  (ECF No. 44, 63.)  But he does not cite any evidence whatsoever to support these claims.  Mr. Smith does not even explain Carl Hartman's role in his case; he was not a witness at his trial.  This claim fails.

### c.      Danny Smith's sentence in unrelated criminal case

Finally, Mr. Smith complains that prosecutors withheld the fact that Det. Leiby directly influenced Judge McGough to ensure that co-defendant Danny Smith received the maximum possible sentence in a different case.  Again, Mr. Smith does not provide any evidence to support this claim, nor does he explain the significance of this information.  This claim also fails.

### 4.      Conclusion

Because Mr. Smith did not satisfy *Brady*'s suppression and favorability prongs, the Court need not examine the collective materiality of the information at issue.  Mr. Smith's *Brady* claims are denied.

### E.      *Eighth Ground for Relief:  Discriminatory Jury Selection*

Mr. Smith's eighth ground for relief is based on *Batson v. Kentucky*, 476 U.S. 79 (1986), which forbids prosecutors from using race as the basis for excusing potential jurors from serving on a jury. Mr. Smith concedes in his Traverse that this claim is unexhausted and abandons it.  (ECF No. 127, 135-36.)

### F.      *Fifteenth Ground for Relief:  Ineffective Assistance of Appellate Counsel*

For his fifteenth ground for relief, Mr. Smith complains of numerous instances of ineffective

assistance of appellate counsel.  Specifically, he argues that his appellate counsel failed to raise the

following claims on direct appeal:

1.    ineffective assistance of trial counsel with respect to the taking and admission
       of the Smith deposition;

2.    ineffective assistance of trial counsel during the trial;

3.    prosecutorial misconduct; and

4.    errors of the trial court.

(ECF No. 44, 97-109.)

### 1.    Procedural Posture

Mr. Smith raised these claims in his *Murnahan* application, which the Ohio Supreme Court

adjudicated on the merits and denied.  *State v. Smith*, 95 Ohio St. 3d 127, 766 N.E.2d 588 (Ohio

2002).  This claim, therefore, is preserved for federal habeas review.

### 2.    Merits

In reviewing this claim, the Ohio Supreme Court opined:

The two-pronged analysis found in *Strickland v. Washington* (1984), 466 U.S. 668, 104
S.Ct. 2052, 80 L.Ed.2d 674, is the appropriate standard to assess whether Smith has
raised a "genuine issue" as to the ineffectiveness of appellate counsel in his request to
reopen under App.R. 26(B)(5). See *State v. Spivey* (1998), 84 Ohio St.3d 24, 25, 701
N.E.2d 696. To show ineffective assistance, Smith must prove that his counsel were
deficient for failing to raise the issues he now presents and that there was a reasonable
probability of success had they presented those claims on appeal. *State v. Bradley* (1989), 42 Ohio St.3d

Moreover, to justify reopening his appeal, Smith "bears the burden of
establishing that there was a 'genuine issue' as to whether he has a 'colorable claim' of
ineffective assistance of counsel on appeal." *State v. Spivey*, 84 Ohio St.3d at 25, 701
N.E.2d 696.

*Strickland* charges us to "appl[y] a heavy measure of deference to counsel's
judgments," 466 U.S. at 691, 104 S.Ct. 2052, 80 L.Ed.2d 674, and to "indulge a strong
presumption that counsel's conduct falls within the wide range of reasonable
professional assistance," *id*. at 689, 104 S.Ct. 2052, 80 L.Ed.2d 674. Moreover, we

must bear in mind that appellate counsel need not raise every possible issue in order to render constitutionally effective assistance. See *Jones v. Barnes* (1983), 463 U.S. 745, 103 S.Ct. 3308, 77 L.Ed.2d 987; *State v. Sanders* (2002), 94 Ohio St.3d 150, 761 N.E.2d 18.

We have reviewed appellant's four propositions of law alleging, inter alia, deficient performance by appellate counsel. We rejected several of these same arguments on Smith's appeal before this court. See *State v. Smith*, 87 Ohio St.3d 424, 721 N.E.2d 93. In any case, however, in none of the four propositions of law has Smith raised "a *genuine issue* as to whether [he] was deprived of the effective assistance of counsel on appeal" before the court of appeals, as required under App.R. 26(B)(5). (Emphasis added.)

*Smith*, 95 Ohio St. 3d at 127, 766 N.E.2d at 589-90.

A defendant is entitled to effective assistance of counsel in his first appeal as a matter of right. *Evitts v. Lucey*, 469 U.S. 387, 396 (1985).  The two-part test enunciated in *Strickland* is applicable to claims of ineffective assistance of appellate counsel.  *Smith v. Robbins*, 528 U.S. 259, 285 (2002). Thus, Mr. Smith must demonstrate that appellate counsel's performance was deficient, and that the deficient performance so prejudiced the appeal that the appellate proceedings were unfair and the result unreliable.  *Strickland,* 466 U.S. at 687.  In reviewing the Ohio Supreme Court's conclusions under § 2254(d)(1), this Court must determine "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard."  *Harrington*, 131 S. Ct. at 788.  An appellant has no constitutional right, however, to have every non-frivolous issue raised on appeal, *Jones v. Barnes*, 463 U.S. 745, 750-54 (1983), and tactical choices regarding issues to raise on appeal are properly left to the sound professional judgment of counsel, *United States v. Perry*, 908 F.2d 56, 59 (6th Cir. 1990). "[O]nly when issues are clearly stronger than those presented, will the presumption of effective assistance of [appellate] counsel be overcome."  *Joshua v. DeWitt*, 341 F.3d 430, 441 (6th Cir. 2003) (internal quotation marks and citations omitted).

Mr. Smith's claims of ineffective assistance of appellate counsel reassert his claims of

ineffective assistance of trial counsel, prosecutorial misconduct and trial court error.  As this Court

finds no merit in those underlying claims, it also finds no merit in these claims.  The Ohio Supreme

Court's decision denying Mr. Smith's *Murnahan* application was reasonable and correct.

> **G.**     ***Nineteenth Ground for Relief:  Unconstitutionality of Ohio's Post-Conviction
> Procedures***

In his nineteenth ground for relief, Mr. Smith broadly challenges the constitutionality of Ohio's

post-conviction scheme, found in Ohio Revised Code § 2953.21.  (ECF No. 44, 120-29, 136-46.)  Mr.

Smith raised this claim to the Ohio Supreme Court in his appeal of the denial of his first post-

conviction petition.  (ECF No. 122-11.)  It is therefore preserved for habeas review.

The claim, however, lacks merit.  It is well-settled that post-conviction state collateral review

is not a constitutional right, even in capital cases.  *See, e.g., Murray v. Giarratano*, 492 U.S. 1, 10

(1989); *Pennsylvania v. Finley*, 481 U.S. 551, 557 (1987); *Estelle v. Dorrough*, 420 U.S. 534, 536

(1975).  Accordingly, the Sixth Circuit repeatedly has held that allegations of constitutional violations,

such as the denial of rights to effective assistance of counsel, due process and equal protection, in

collateral proceedings are not within the scope of federal habeas corpus review.  *See, e.g., Alley v.

Bell*, 307 F.3d 380, 387 (6th Cir. 2002) ("error committed during state post-conviction proceedings

can not [sic] provide a basis for federal habeas relief"); *Greer v. Mitchell*, 264 F.3d 663, 681 (6th Cir.

2001) ("habeas corpus cannot be used to mount challenges to a state's scheme of post-conviction

relief"); *Kirby v. Dutton*, 794 F.2d 245, 248 (6th Cir. 1986).  The Sixth Circuit has explained that "the

writ is not the proper means by which prisoners should challenge errors or deficiencies in state

post-conviction proceedings . . . because the claims address collateral matters and not the underlying

state conviction giving rise to the prisoner's incarceration."  *Kirby*, 794 F.2d at 247.

**VII.    Certificate of Appealability Analysis**

This Court must now determine whether to grant a Certificate of Appealability ("COA") for any of Mr. Smith's grounds for relief.  The Sixth Circuit has determined that neither a blanket grant nor a blanket denial of a COA is an appropriate means by which to conclude a capital habeas case as it "undermine[s] the gate keeping function of certificates of appealability, which ideally should separate the constitutional claims that merit the close attention of counsel and this court from those claims that have little or no viability."  *Porterfield v. Bell*, 258 F.3d 484, 487 (6th Cir. 2001); *see also Murphy v. Ohio*, 263 F.3d 466 (6th Cir. 2001) (remanding motion for certificate of appealability for district court's analysis of claims).  Thus, in concluding this Opinion, this Court now must consider whether to grant a COA as to any of the claims Mr. Smith presented in his Petition pursuant to 28 U.S.C. § 2253.

That statute states in relevant part:

(c)(1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from --

> (A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court . . .

(2) A certificate of appealability may issue under paragraph (12) only if the applicant has make a substantial showing of the denial of a constitutional right.

28 U.S.C. § 2253.  This language is identical to the requirements set forth in the pre-AEDPA statutes, requiring the habeas petitioner to obtain a Certificate of Probable Cause.  The sole difference between the pre- and post-AEDPA statutes is that the petitioner must now demonstrate he was denied a *constitutional* right, rather than the federal right that was required prior to AEDPA's enactment.

The United States Supreme Court interpreted the significance of the revision between the pre- and post-AEDPA versions of that statute in *Slack v. McDaniel*, 529 U.S. 473 (2000).  In that case, the Court held that § 2253 was a codification of the standard it set forth in *Barefoot v. Estelle*, 463 U.S.

104

880 (1983), but for the substitution of the word "constitutional" for "federal" in the statute.  *Id.* at 483.

Thus, the Court determined,

> [t]o obtain a COA under § 2253(c), a habeas prisoner must make a substantial showing
> of the denial of a constitutional right, a demonstration that, under *Barefoot*, includes
> showing that reasonable jurists could debate whether (or, for that matter, agree that) the
> petition should have been resolved in a different manner or that the issues presented
> were "adequate to deserve encouragement to proceed further."

*Id.* at 483-04 (quoting *Barefoot*, 463 U.S. at 893 n.4).

The Court went on the distinguish the analysis a habeas court must perform depending upon its

finding concerning the defaulted status of the claim.  If the claim is not procedurally defaulted, then a

habeas court need only determine whether reasonable jurists would find the district court's decision

"debatable or wrong."  *Id.* at 484.  A more complicated analysis is required, however, when assessing

whether to grant a COA for a claim the district court has determined is procedurally defaulted.  In

those instances, the Court opined, a COA should only issue if "jurists of reason would find it debatable

whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason

would find it debatable whether the district court was correct in its procedural ruling."  *Id.*

After taking the above standards into consideration, the Court finds as follows:

The Court will not issue a COA for grounds for relief: 1 (ineffective assistance of trial

counsel), sub-claims 1(m), (o), and (s); 5 (ineffective assistance of trial counsel), sub-claims 2(a), 3(a)

through (d), (f), and (g), 4(a) and (b), and 5(b) and (c); 4 (trial court error), sub-claims 4(a), and 5(a)

though (e); 8 (discriminatory jury selection); 15 (ineffective assistance of appellate counsel), sub-

claims 1, 2, and 4; and 19 (unconstitutionality of Ohio's post-conviction procedures).  No jurist of

reason would debate the Court's conclusions on these claims.

No COA will issue for grounds for relief: 1 (ineffective assistance of trial counsel), except sub-

claims 1(m), (o), and (s); 3 (prosecutorial misconduct), all sub-claims except 1; 4 (trial court errors) all sub-claims except 4(a), and 5(a) though (e); 5 (ineffective assistance of trial counsel), except sub-claims 2(a), 3(a) through (d), (f), and (g), 4(a) and (b), and 5(b) and (c); 14 (trial court error regarding Mr. Smith's statements to police), because they are unequivocally procedurally defaulted.

This Court will issue a COA for the following grounds for relief:  2 (trial court error regarding admission of Michael Smith deposition); 3, sub-claim 1 (prosecutorial misconduct regarding availability of Michael Smith to testify at trial); 6, sub-claim 1 (*Brady* claim regarding information about Michael Smith's whereabouts); 15, sub-claim 3 (ineffective assistance regarding prosecutorial misconduct claim concerning Michael Smith deposition).  A reasonable jurist could debate this Court's conclusions regarding the State's involvement in Michael Smith's unavailability for trial and the State's efforts to locate Michael Smith to testify at Mr. Smith's trial; the trial court's ruling on those issues; and appellate counsel's failure to raise those issues on appeal.

## VIII.  Conclusion

For the foregoing reasons, the Petition is denied.  The Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that an appeal from this decision could be taken in good faith as to the sub-claims specified above asserted under grounds for relief 2, 3, 6, and 15, and the Court issues a certificate of appealability pursuant to 28 U.S.C. § 2253(c) and Federal Rule of Appellate Procedure 22(b) as to those claims only.  As to all remaining claims, the Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that an appeal from this decision could not be taken in good faith, and that there is no basis upon which to issue a certificate of appealability.  28 U.S.C. § 2253(c); Fed. R. App. P. 22(b).

IT IS SO ORDERED.

/s/ Lesley Wells
LESLEY WELLS

106

UNITED STATES DISTRICT JUDGE

March 31, 2014